**Bettye A. SANDERS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 73-263.**

United States District Court, N. D. Alabama, S. D.

Dec. 6, 1973.

Richard J. Cohn, Sirote, Permutt, Friend & Friedman, Birmingham, Ala., for plaintiff.

Wayman G. Sherrer, U. S. Atty., Charles D. Stewart, Asst. U. S. Atty., Benton Burroughs, Jr., Atty., Tax Div., Dept. of Justice, Washington D.C., for defendant.

## OPINION

GUIN, District Judge.

This is an action for the refund of federal income taxes and penalties paid by the plaintiff with respect to the calendar years 1968 and 1969, plus interest thereon. Plaintiff Bettye A. Sanders ("Bettye") was during these years the wife of Charles J. Sanders ("Charles"), who died on November 2, 1970. Bettye and Charles signed joint federal income tax returns for the years 1968 and 1969. For 1968, Charles reported gross income of $63,523.89; for 1969, he reported gross income of $36,087.38. All gross income for 1968 and 1969 was earned by Charles, with the exception of $2,058.75, which was earned by Bettye as a secretary employed by the Homewood, Alabama, Church of Christ.

Charles died unexpectedly in November, 1970. On July 19, 1971, the District Director of Internal Revenue for the State of Alabama notified Bettye, and Charles' Estate, of income tax deficiencies for 1968 of $7,327.93, and for 1969 of $20,120.79, plus 5% negligence penalties. Charles' estate was insolvent. Bettye paid the asserted deficiencies and penalties, plus interest.

She then filed suit, to recover from the defendant those deficiency amounts paid which were attributable to asserted omissions by Charles of gross income from his and Bettye's joint federal income tax returns. The notice of deficiency asserted omissions for 1968 of $18,800.97 of gross income, from unknown sources; for 1969, $6,316.73 from unknown sources and $71,000.00 of capital gain resulting from the sale of 25 shares of stock of Continental Marketing Associates, Inc. ("CMA"), a company for which Charles worked during these years.

Plaintiff is basing her action entirely upon the provisions of Section 6013(e) of the Internal Revenue Code of 1954, which provides that—despite the general rule that a spouse executing a joint income tax return is jointly and severally liable for taxes—she may avoid liability if she can establish that

(1) there was omitted from gross income an amount properly includable therein which was attributable to her husband and which is in excess of 25% of the amount

of gross income stated in the return,

(2) she did not know of, and did not have reason to know of, such omission or omissions, and

(3) taking into account whether or not she significantly benefited directly or indirectly from the omissions from gross income, and taking into account all other facts and circumstances, it is inequitable to hold her liable for the deficiency in tax attributable to such omissions.

This statute, enacted on January 12, 1971, is commonly referred to as the "innocent spouse statute".

## FINDINGS OF FACT

1. Bettye and Charles were husband and wife during the years 1968 and 1969, and for those years filed and signed joint federal income tax returns.

2. Subsequently, in a federal income tax audit, agents of the Internal Revenue Service reconstructed Charles' gross income for 1968 and 1969 by using the "bank-deposits-plus-expenditures" method of accounting, permitted under Section 446(b) of the Internal Revenue Code of 1954. This is one of several methods of accounting which the Government is entitled to impose upon a taxpayer with either no regular method of accounting, or a method of accounting that does not clearly reflect his income. It consists essentially of a beginning assumption that all bank deposits, and provable expenditures, reflect gross income to the taxpayer. The taxpayer is however given credit for bank deposits which can be shown to represent transfers of funds from other bank accounts, or other items which the taxpayer can demonstrate did not represent gross income, and for cash expenditures that can similarly be traced to sources other than gross income. Gross income ascertained under this method of accounting by the Internal Revenue Service amounted to an additional $18,800.97 for 1968 and $6,316.73 for 1969.

4. In 1969 Charles sold certain shares of stock in CMA for a capital gain of $71,000.00. He was unable to transfer the stock in 1969, being legally restricted in that respect because of certain stockholder agreements, and consulted with an accountant, Hollis Dickey, as to whether or not to report the capital gain in 1969. The accountant, according to his testimony, in turn consulted with the Internal Revenue Service and was advised that the gain was not reportable in 1969. Accordingly, Charles and his accountant decided not to report it.

5. As the testimony of the Internal Revenue Service agent who conducted the audit of Charles and Bettye's 1968 and 1969 tax returns, Mr. Vincent Alfano, demonstrated clearly, the bank deposits plus expenditures method of accounting is an exceedingly complex accounting function. The Sanders through this period had a total of some eight bank accounts, with considerable transfers among them; that Charles' business affairs were unusually complex in 1968 and 1969, covering as they did a period of his life when he left practice as a chiropractic physician in order to engage in various marketing enterprises; that he worked during this period for at least three different companies, sometimes for more than one at a time, one of which companies he founded himself; that during 1968 and 1969 he made extensive borrowings, many of which probably resulted in large bank deposits that should not have been required to be included in gross income, though in fact they were; that for approximately a year during the period of time in question, most of these activities were carried on from Montgomery, Alabama, while Charles' home remained in Birmingham, maintained by his wife; that some of these companies reimbursed Charles for expenses, which again would result in deposits—not, at this date, precisely identifiable—which should not have been required to be included as gross income, although in fact they were.

6. At irregular intervals, Bettye at Charles' insistence balanced checkbooks for most of the bank accounts they had during 1968 and 1969. She also, on occasion, typed letters for her husband, again at his insistence. Among them were some letters in the Spring of 1969 to CMA, from the sale of whose stock Charles derived the omitted capital gain, which fulfilled Charles' legal obligation to inform CMA of his intention to sell his shares of stock and to tender that stock first to CMA.

7. Bettye is a housewife, with a high school education. She is an experienced secretary and typist, and types without comprehension. She had, during the years in question, emotional problems involving serious depression and anxiety, which resulted in her later consulting a psychiatrist, Dr. William D. King, who testified on her behalf. She had at the time a severe drinking problem, and the evidence at trial showed that she was drinking during 1968 and 1969 approximately a quart of whiskey per day. In the Spring of 1969, her mental and emotional condition was extremely aggravated by several unwelcomed events. At Charles' insistence Bettye and Charles adopted a child, at the time against Bettye's wishes. Charles, again against Bettye's wishes, purchased a new residence. Finally at that time, Charles left Montgomery and resumed residence in Birmingham, disconcerting Bettye, who had grown accustomed to living alone and whose drinking problems were thereby made more obvious and more difficult to conceal.

8. Charles' and Bettye's tax returns were prepared by an accountant, Hollis Dickey, who was an acquaintance of Bettye's at a previous place of employment, upon whom she put considerable confidence and reliance, and in fact whom Charles had employed at her recommendation. Mr. Dickey's behavior towards Bettye at all times was such as to assure her as to the propriety of her and Charles' joint federal income tax returns, and in fact, Mr. Dickey himself, until the time of the aforementioned Internal Revenue Service audit, was himself of the opinion that the income tax returns he had prepared fully and fairly reflected Charles' and Bettye's gross income. The only omission of which he was aware was the capital gain omitted at the advice of the Internal Revenue Service.

9. The omissions from gross income properly includable for both 1968 and 1969 were in excess of 25% of the amount of gross incomes stated in the returns. They should properly include and reflect a cash expenditure of $4,000 in 1968 to one Ned Oliver for an oil well investment.

10. Charles did not confide financial matters to his wife and indicated, at several times, to friends that it was his policy not to do so. Bettye did not know, or have reason to know, of the omissions of gross income attributable to Charles from their 1968 and 1969 joint income tax returns.

11. Taking into account all facts and circumstances, including whether or not Bettye significantly benefited directly or indirectly from the omissions from gross income, it would be inequitable to hold her liable for the assessed deficiencies, together with penalties and interest, attributable to the omissions of gross income with respect to the years 1968 and 1969.

## CONCLUSIONS OF LAW

The defendant has taken issue with the plaintiff with respect to all three of the elements she must establish under § 6013(e), the "innocent spouse statute," in order to avoid liability for the above mentioned taxes for 1968 and 1969.

▆▆ The parties stipulated that there was an omission of gross income in excess of 25% of that required to be stated in the return for 1969; whether there was such an omission in 1968 is the preliminary issue in the case for that year. Although the defendant in assessing a deficiency for 1968 found an omission in excess of 25%, $4,000.00 of this asserted omission represented a

$4,000.00 payment which Charles had made in 1968 to one Ned Oliver for an investment in an oil well. Since a check could not be found covering the payment, it was assumed under the bank deposits plus expenditures method that the $4,000.00 represented gross income from some unknown source. The oil well was dry, the investment was a loss, and Charles also took a $4,000.00 deduction for this payment to Mr. Oliver.

At trial, the Government asserted, contrary to agent's report, that the payment had never been made to Mr. Oliver, that therefore the omission from gross income was $4,000.00 less than asserted in the notice of deficiency, and that in turn the innocent spouse statute was not available to plaintiff for 1968. As for the ultimate tax due, however, defendant claimed that this should not be affected, as instead of including the $4,000.00 in gross income, it could have merely disallowed the corresponding deduction when the oil well proved to be dry. In the opinion of the Court, the $4,000 was in fact paid to Mr. Oliver in 1968 and the gross income omission for 1968 therefore excluded 25%. Mr. Oliver testified by deposition that, although he did not specifically recall receiving $4,000.00 in cash from Charles in 1968, or at any other time, he had indeed signed and handed over to Charles a receipt for the $4,000.00, which receipt plaintiff introduced as evidence in this case. He also stated rather firmly that he doubted he had ever written anyone a receipt for a payment which in fact had not been made to him, and could think of no reason why he would do so. His memory was vague as to specifics of his business dealings in 1968 and 1969; his records for those years have been destroyed; and he has since left the oil business and returned to his former occupation as a member of the merchant marine. Under the circumstances, it seems wiser to the Court to trust the receipt as evidence that the $4,000.00 payment was made, either by cash or by cashier's check, and that under the method of accounting chosen by defendant, it properly belonged in gross income.

Furthermore, there was a 25% omission as a matter of law. Section 6013(e)(2) of the Internal Revenue Code of 1954 refers over to Section 6501(e)(1)(A) for the method of determining the amount omitted from gross income; that Section in turn requires the inclusion of such amounts as are "required to be shown on the return." This $4,000.00 has indeed been required to be shown on the return; defendant in administering the Internal Revenue Code itself so required, regardless of what other means it now claims it could have used to produce the tax deficiency result it desires.

The Court is of the considered opinion that because the Court finds the $4,000.00 was in fact paid to Mr. Oliver in 1968, it is unnecessary to reach the estoppel issue raised by the plaintiff.

■ The second issue is whether, under the innocent spouse statute, Bettye knew of, or had reason to know of, the omissions from gross income for 1968 and 1969. The Court finds that she did not.

As to whether she actually knew of the omissions, plaintiff's testimony is practically the only possible direct evidence. She testified that she did not know, and her testimony was corroborated in a number of ways. She has freely disclosed and submitted evidence unfavorable to her as well as favorable, evidence which could be thought to indicate knowledge as well as evidence of lack of knowledge. That she had emotional and drinking problems during the years in question is established. The testimony of her psychiatrist establishes it, as does the testimony of friends that she confessed her drinking problems to them and attended meetings of the Alcoholics Anonymous. Her ability to understand matters as complicated as Charles' finances was seriously impaired, and accordingly, the Court's finding that she did not know of the omissions from gross income is all the more buttressed.

As to whether or not she had reason to know of the omissions, considerable

evidence was introduced by both plaintiff and defendant. Plaintiff has, in the opinion of the Court, proven that Charles was an uncommunicative husband about financial affairs; that she during these years was suffering from the emotional and drinking problems noted above; that events happened in the Spring of 1969, at about the time of the signing of the 1968 return and of the sale of CMA stock, that aggravated these problems, among them the newly-born adopted child and the new house; that the tax returns were prepared by an accountant, whom Bettye had a right to trust; and that in fact they stated considerable gross income, regardless of any omissions that may have later been found, and if anything, an examination of them would have reassured her that her husband's tax affairs were being handled capably. Defendant points to the fact that the new house was acquired and a good deal of associated expenses to improve it were made; that Charles bought new cars during the years in question; that he invested in a resort condominium; and that he took several trips to Las Vegas, which, although they were so-called "junkets" and his travel, food and lodging were free, must have involved some other expenditures which might have given Bettye reason to know of omissions from gross income. On the other hand, plaintiff points out that the cost of the house was relatively modest; that it was mortgaged heavily; that the condominium likewise represented only an equity investment, and was bought with borrowed money; and that in general there were no "lavish or extravagant" expenses of the type referred to in Patricia E. Mysse, 57 T.C. 680 (1972), 1972–2 C.B. 2(20), which might have put Bettye on notice of omissions from gross income.

In the *Mysse* case, the dead husband's expenditures were considerable, being even in excess of his reported gross income in three of the years in issue. Unlike the present case, in' *Mysse* the reported gross incomes were relatively small. Mrs. Mysse was held to be an "innocent spouse" not liable for the tax; yet, considering her husband's smaller gross incomes and higher expenditures, it would seem that she would have been more likely than plaintiff in the instant case to have known of omissions.

It is difficult to know how far to carry a comparison with the *Mysse* case. For example, Mr. Mysse does not appear to have taken junkets to Las Vegas; on the other hand, unlike Charles, his personal expenditures went so far as to include the acquisition of a Jaguar automobile. In the instant case, plaintiff admitted to having balanced checkbooks for various of her and Charles' numerous bank accounts. She would thus have been exposed, at least in a mechanical sense, to some of the data from which the agent Alfano later reconstructed Charles' gross income. Mrs. Mysse does not seem to have balanced checking accounts; however, it does not appear either that she did not balance checking accounts. It is a common enough task for housewives, and the court in *Mysse* may simply have taken no notice of it. Bettye also typed some letters reflecting or reciting certain aspects of the sales of stock from which Charles did not, at the advice of his accountant and the Internal Revenue Service, include the capital gain for 1969. It does not appear that Mrs. Mysse ever assisted her husband in this fashion with respect to any of his financial affairs, but again, she may have. Bettye is an experienced secretary, and testified that the letters in question were typed from copy and that she types without comprehension of the contents of what she is typing and did so on the occasion of the letters. In addition, unlike Mrs. Mysse, Bettye can plead that her husband's gross incomes as reported were very large, giving her less reason to suspect an omission; that the tax returns were prepared by an accountant whom she trusted and whom she had recommended for the job; that a substantial part of her husband's income was earned at business activities carried on 100 miles away from home in Montgomery, Alabama, where Charles

during this period of time lived in his own apartment; and in general that Charles' business affairs were exceedingly complex, involving as many professions and different employments as they did. The Court is persuaded that she had at least as little reason to know as did Mrs. Mysse in the *Mysse* case, and that she has fulfilled her burden of proving that she had no reason to know within the meaning of the statute. Most of the expenditures made by Charles, to Bettye's knowledge, were in the nature of ordinary support for his family and such expenditures in the opinion of the Tax Court in the *Mysse* case and in the opinion of this Court are not, under the innocent spouse statute, sufficient to put a spouse on such notice as would destroy her innocence. The Court is mindful that Bettye balanced checkbooks, but to hold that this gave her reason to know would be almost equivalent to holding her responsible for deducing omissions from gross income under a rather esoteric method of accounting which apparently gave an experienced, capable and diligent revenue agent, Mr. Alfano, considerable difficulties. The Court is unwilling to impose such a high standard of care upon a housewife, untrained in accounting or finance, under the innocent spouse statute. Bettye testified that she typed the letters without comprehension; they were few in number; typing without comprehension is a common phenomenon among experienced typists; and the Court believes her. In short, plaintiff has proven to the Court's satisfaction that, as a reasonably prudent taxpayer, she had no reason to know of the omissions.

■ As to whether or not she benefited from the omissions, defendant has pointed out that after her husband's death in 1970, Bettye received somewhat under $150,000.00 in life insurance proceeds. She also received the equity in the house which was purchased in 1969, and the equity in the condominium, which was immediately sold at a loss. However, aside from insurance and such property equities as passed by joint survivorship deed, all of which property was mortgaged, Charles' estate was insolvent and she received no distribution from it beyond Charles' personal effects.

As for the insurance proceeds, one policy had been taken out before the years of omissions, in 1966, and the second and final policy was taken out early in 1968. There does not appear to be any suspicion of Charles' thereby attempting to divert ill-gotten or untaxed gains to Bettye. The policies were heavily borrowed against, and in effect the premiums were largely self-financed. On balance, the Court does not feel that these inheritances represent a significant benefit under the statute, whether direct or indirect. The amount of life insurance is not remarkable, and, in fact, it is doubtful whether in and of itself it will provide enough income for the support of Bettye and her child. There is nothing remarkable or ostentatious about the house; as for the condominium, it was sold at a loss, the only time Bettye even saw it was the day Charles purchased it, and Charles himself only saw it once more when some difficulties were encountered in its construction and he felt obliged to investigate them.

■ Even beyond the fact that she did not significantly benefit from the omissions, the Court under Section 6013(e) is directed to consider whether taking into account all *other* facts and circumstances it would be inequitable to hold Bettye liable for the deficiencies. The Court finds that it would be inequitable. She is a widow, with a child to support, who is not yet school age. She has a household to maintain. It is unlikely that she will be able to work in the foreseeable future. At such time as she can work, it is uncertain what her employment prospects will be, considering her age and education. While plaintiff became greatly disturbed at trial in admitting that she opposed the adoption of her child in 1969, and stated that in fact the child was now very much wanted and loved, the fact remains that at

the time it was Charles, and not Bettye, who wanted to adopt a child. As it turns out, probably most of any benefit from any of Charles' omissions from gross income will eventually accrue to the child—for his feeding, shelter and education. Bettye of course has an obligation to support the child; while it is one she appears to meet gladly, it still should be taken into consideration in determining whether or not she benefited from Charles' omissions from gross income and whether it would be equitable to hold her liable for the deficiencies in tax.

Finally, it would be inequitable to hold Bettye liable for the tax deficiencies because of the unique interaction of the bank deposits plus expenditures method, and the innocent spouse statute, as noted to some degree above. Essentially, the use of this accounting method by defendant puts the obligation upon the taxpayer to explain which of his bank deposits, etc., represented gross income, and which did not. Charles Sanders made many bank deposits, which the agent Alfano uncovered, that did *not* represent gross income. There were, for example, considerable deposits of loans and considerable transfers among bank accounts. The sources of all bank deposits have by no means been identified, nor have all the loans that Charles is known to have made in 1968 and 1969 been "given credit for" as a reduction of the gross income which the bank deposits presumptively represent. For example, bank deposits were found to represent $13,796.27 in omitted gross income for 1968 and $5,773.02 for 1969. As it happens, there were approximately, though certainly not precisely, the same amounts of loans made by Charles during these years which were never connected with any particular bank deposits. Some of this "omitted gross income" may have been, not income in the economic sense, but deposits of loan proceeds. An example will suffice. On April 13, 1968, Charles borrowed $1,250 from one William L. Clegg, who lived out of state. Mr. Alfano did not correlate this loan with any bank deposit. Five days later, on April 8, 1968, there was a deposit of $1,250 to Charles' special account at the City National Bank of Birmingham. This item is among the "unidentified deposits" which agent Alfano found were gross income. The loan was made to Charles by means of a check sent through the mail. The Court cannot help but suspect that, were Charles alive, his testimony might establish that in fact this item, and others, should not have been included in gross income. With Charles dead, Bettye is in a much more difficult position. She lacks the knowledge to be able to testify which deposits represent proceeds of loans, or non-taxable reimbursements by Charles' various employers, or bank transfers, or any of a number of the many other possible sources for bank deposits which would not have been gross income. While the Court is unwilling to go so far as to say that it would never be equitable to hold a spouse liable under the innocent spouse statute for gross income "discovered" by means of alternate methods of accounting imposed under Section 446 of the Internal Revenue Code, the Court is satisfied that in this case it would be inequitable. Some of these items may not have been income at all, and it may be impossible for anyone to have benefited from them. Further, the Court is not impressed with defendant's argument, and agent Alfano's testimony, that since Alfano informed Charles, approximately a month before he died unexpectedly, that his bank deposits exceeded his reported gross income, Charles had adequate opportunity to meet his burden of proof under Section 446 and it would therefore not be inequitable to hold Bettye liable for the tax. Charles did not of course know when he was to die; and even if he had, it is hardly clear to the Court that one month was adequate time for Charles to explain his bank deposits and carry his burden of proof in his dispute with the Internal Revenue Service.

* * * * * *

Consistent with the foregoing, it is hereby ordered that judgment in this case be for plaintiff and that she recover from the defendant the sums of $6,301.40 for the year 1968 and $19,360.06 for the year 1969, representing the amounts of deficiencies paid attributable to the gross income omitted from her husband Charles' tax returns; together with a refund of 5% of such sums, representing assessed penalties attributable thereto; interest paid by plaintiff on such portions of deficiencies and penalties; together with $96.80, representing that part of a late payment penalty paid by her with respect to the above amounts. Additionally, defendant is ordered to pay plaintiff 6% interest on such sums, since plaintiff's payment of them, in the manner provided by Section 6611.