Bettye A. SANDERS,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 74–1862.

United States Court of Appeals,
Fifth Circuit

March 7, 1975.

164

Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Wayman G. Sherrer, U. S. Atty., Charles D. Stewart, Asst. U. S. Atty., Birmingham, Ala., Benton Burroughs, Jr., Meyer Rothwacks, Chief, Appellate Sec., Ernest J. Brown, Elmer J. Kelsey, Liberto Marinelli, Jr., Michael L. Paup, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Richard J. Cohn, Robert B. Eubank, Birmingham, Ala., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and ROSENN,* Circuit Judges.

* Of the Third Circuit, sitting by designation.

THORNBERRY, Circuit Judge:

This is a refund suit for taxes paid by appellee, Mrs. Bettye Sanders, with respect to calendar years 1968 and 1969. Bettye and her husband Charles, who died of a heart attack on November 2, 1970, filed joint income tax returns for these two years. All gross income for the period in question, except $2,058.75, was earned by Charles. In midsummer 1971 the IRS assessed deficiencies amounting to just over $30,000.00 against appellee and Charles's estate because of the Commissioner's discovery, using the so-called bank deposits plus expenditures accounting method, of substantial unreported income received by Charles during the tax years here in issue.[1] Since the estate was insolvent, Mrs. Sanders paid the entire assessment. She then brought this suit to recover the sums paid, claiming that she was an "innocent spouse" protected by 26 U.S.C. § 6013(e) (1971). After a nonjury trial the district court entered judgment in appellee's favor and filed an opinion.[2] We affirm.

Married taxpayers who choose to accept the benefits of filing a joint tax return are in turn jointly and severally liable for the tax due on their combined incomes. 26 U.S.C. § 6013 (1967). Because this joint and several liability often produced hardship on an "innocent spouse" whose marriage partner received substantial unreported income and then disappeared, leaving the spouse to pay a large deficiency,[3] Congress in 1971 enacted § 6013(e):

(1) In General.—Under regulations prescribed by the Secretary or his delegate, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

\*    \*    \*    \*    \*    \*

The government does not now dispute the district court's finding that appellee meets the requirements of (e)(1)(A), but it does vigorously contest the conclusion that appellee qualifies under (e)(1)(B) and (e)(1)(C). In the interests of clarity we will discuss separately the district court's findings and conclusions concerning the contested subsections.

## I. Section 6013(e)(1)(B)

The lower court found that Mrs. Sanders "did not know, or have reason to know, of the omissions of gross income attributable to Charles from their 1968 and 1969 joint income tax returns." 369 F.Supp. at 163. As to actual knowledge the judge simply credited Mrs. Sanders's testimony that she knew nothing of the omitted items of income.

---

1. The notice of deficiency alleged omissions from gross income for 1968 of $18,800.97, from unknown sources; for 1969, $6,316.73 from unknown sources and $71,000.00 of capital gain resulting from the sale of certain shares of stock.

2. Sanders v. United States, N.D.Ala.1973, 369 F.Supp. 160.

3. *Compare* Estate of Upshaw v. C.I.R., 7th Cir. 1969, 416 F.2d 737; Horn v. C. I. R., 5th Cir. 1967, 387 F.2d 621, *with* Sharwell v. C.I.R., 6th Cir. 1969, 419 F.2d 1057; Huelsman v. C.I.R., 6th Cir. 1969, 416 F.2d 477; Scudder v. C.I.R., 6th Cir. 1968, 405 F.2d 222.

This finding of fact, turning as it does entirely on a credibility determination by the trial judge, comes to us with a strong presumption of correctness. It is not clearly erroneous. Fed.R.Civ.P. 52(a). Accordingly we must turn our attention to the government's primary contention relating to this subsection: Did the district judge apply an erroneous legal standard in determining that Bettye Sanders had no reason to know of the unreported income?[4] The lower court cited a number of factors that led it to conclude that appellee met the "no reason to know" test: (1) Charles's financial affairs were complex and took even the IRS a good deal of time to unravel; (2) appellee was a high school educated housewife who during this period was having severe emotional problems heightened by heavy alcoholic consumption; (3) Charles rarely confided in appellee concerning his business affairs; (4) appellee placed great trust and reliance on their accountant, whom she had recommended to her husband; (5) although appellee typed letters for her husband concerning the transactions that resulted in the unreported income, she is an experienced typist who types without comprehension of her material; and (6) although appellee balanced checkbooks for her husband that showed large deposits in excess of reported income, this was insufficient to convey knowledge because it took the IRS over 100 manhours to deduce the omissions from the same checkbooks. Finally, to explain in part why a new home with interior and exterior improvements, new expensive automobiles each year, gambling trips to Las Vegas, and a new condominium in the Bahamas did not put appellee on notice of omissions from gross income, the court noted "that the cost of the house was relatively modest; that it was mortgaged heavily; that the condominium likewise represented only an equity investment, and was bought with borrowed money . . . ." 369 F.Supp. at 165. As we understand its position, the government makes no real challenge to these individual factfindings but instead questions whether, in light of the circumstances of this case, the district court has not read the "no reason to know" requirement too liberally in the taxpayer's favor.

The government suggests that subparagraph (B) puts the burden on the taxpayer to prove that she was "completely without fault and could not possibly have discovered the omission before executing the returns." (Appellant's Brief at 17.) The taxpayer, on the other hand, suggests that the highest permissible standard of care would be what a reasonable person in the taxpayer's subjective position would have discovered. (Appellee's Brief at 18–19.) The district court seems to have adopted appellee's standard, for the opinion states that "plaintiff has proven to the Court's satisfaction that, *as a reasonably prudent taxpayer*, she had no reason to know of the omissions."[5] 369 F.Supp. at 166 (emphasis added).

We agree with Mrs. Sanders that the government's proposed test is too stringent and thus inconsistent with the remedial purpose of § 6013(e). Admittedly the statute was passed as an exception to the normal rule of joint and several liability. Jerome J. Sonnenborn, 57 T.C. 373, 380 (1971). But Congress intended the exception to remedy a perceived injustice, and we should not hin-

---

4. If we find that the district judge adopted the correct interpretation of the phrase "know or reason to know," his decision on whether a party falls within it would be reversed only if clearly erroneous. *See* Griffin v. Missouri Pacific Railroad Co., 5th Cir. 1969, 413 F.2d 9, 12–13. The government's contention that the phrase has a meaning in this tax statute different from its ordinary legal usage, however, presents a question of law.

5. We do not interpret this test as excluding consideration of the taxpayer's subjective condition when assessing the reasonableness of her actions. But neither does it preclude the setting of judicially-defined minima of reasonable prudence for individual taxpayers or classes of taxpayers. Hence, in some circumstances it might be possible for a court to conclude as a matter of law that a given taxpayer had reason to know of omissions from gross income.

der that praiseworthy intent by giving the exception an unduly narrow or restrictive reading.[6] Moreover, the test suggested by the taxpayer and apparently adopted by the district court is in line with the usual legal understanding of the phrase "reason to know":

> A person has reason to know of a fact if he had information from which a person of ordinary intelligence which such person may have, or of the superior intelligence which such person may have, would infer that the fact in question exists or that there is such a substantial chance of its existence that, if exercising reasonable care with reference to the matter in question, his action would be predicated upon the assumption of its possible existence.

Restatement (Second) of Agency § 9, comment d (1958). Finally, we do not read the opinions by other courts who have been called upon to construe this language in (e)(1)(B) as inconsistent with the standard that we today approve. Although the Tax Court has cited a number of factors that it believes can be decisive in making the "reason to know" determination—factors that we will examine shortly when deciding whether the district judge clearly erred here—its opinions offer scant support for the strict reading suggested by the government.[7]

■ It remains only for us to determine, then, whether the district court clearly erred in concluding that Bettye Sanders had no reason to know of the omissions from gross income on the joint returns.[8] The question is close, even under the lower court's less restrictive reading of (e)(1)(B). Examination of the cases suggests at least three factors that courts have thought significant in deciding whether a spouse had reason to know of omissions from gross income: (1) unusual or lavish expenditures;[9] (2) participation in business affairs or bookkeeping;[10] and (3) the "guilty" spouse's refusal to be forthright about the couple's income.[11] The district court here

6. Although rejecting the government's proposed test, we in no way reject its argument that Congress did not intend § 6013(e) to provide wholesale relief from joint and several liability. Nor do we ignore the benefits that both spouses ordinarily derive from the reduction in tax that results when a joint return is filed. See Jerome J. Sonnenborn, 57 T.C. 373, 380 (1971). We simply implement Congress' clearly stated intent that courts should not limit the relief afforded by § 6013(e) to the case where assessment of the tax would be patently harsh and oppressive but should instead consider the individual situation of each taxpayer who arguably comes within the statute's coverage. S.Rep.No. 91-1537, 1970 U.S.Code Cong. & Admin.News, pp. 6089, 6091.

Concededly, some legislative history supports the government's contention. For example, when the House Ways and Means Committee reported the bill out to the whole House, the speakers stressed the cases where then-existing law resulted in clear injustice and oppression. 116 Cong.Rec. 43351 (1970). We believe, however, that the Senate Report is a clearer reflection of Congress' final intent.

7. In Patricia E. Mysse, 57 T.C. 680 (1972) the Tax Court noted that the husband's expenses were "not of such character as to cause a reasonably prudent person with Patricia's knowledge of the family finances to question the source of the funds." *Id.* at 698–99.

8. Our review on this issue will be more intensive than on the actual knowledge question, because the ultimate "reason to know" determination involves not just inferences about the taxpayer's subjective position as revealed by her demeanor at trial but also secondary inferences drawn from the primary facts as found by the district court. See 5A Moore, Federal Practice § 52.03[1].

9. Patricia E. Mysse, 57 T.C. 680, 699 (1972).

10. See Howard B. Quinn, 62 T.C. 223 (1974); Jerome J. Sonnenborn, 57 T.C. 373, 381–382 (1971); Cecelia M. Harmon, T.C.Memo 1974–82; Schwartz v. C.I.R., T.C.Memo 1973–226; Chanik v. C.I.R., T.C.Memo 1972–174, aff'd, 6th Cir. 1974, 492 F.2d 1182.

11. Raymond H. Adams, 60 T.C. 300, 303 (1973). In *Adams* the taxpayer's wife kept the family books and prepared the joint income tax returns. During the tax years in question she omitted income earned by her as sales commissions and consistently refused to furnish copies of the returns to her husband. In holding that Mr. Adams failed to meet the requirements of (e)(1)(B) the Tax Court accepted the Commissioner's argument that the husband was put on notice of the omissions by his wife's refusal to disclose the family

added at least three more: the claimant spouse's emotional condition during the period in question, the complexity of the financial transactions that produced the funds, and the complexity of the method used by the IRS for deducing the omissions.

In Patricia E. Mysse, 57 T.C. 680 (1972), a wife whose husband had embezzled large sums of money from the bank where he worked and neglected to report these amounts as gross income was held to satisfy (e)(1)(B), but the court warned that spouses would not be allowed to "close . . . [their] eyes to unusual or lavish expenditures." 57 T.C. at 699. As noted, the district judge in this case apparently accepted appellee's explanation of why the new home and improvements thereon, the new cars, the gambling trips, and the condominium in the Bahamas were not lavish or unusual. We feel constrained to point out, however, that except for the purchase of a Jaguar automobile that required a cash outlay of only $1000.00, the expenses of the husband in Mysse were at least arguably less "unusual" than those involved here: Mr. Mysse paid income taxes, his sons' college expenses, mortgage payments on the family residence, bills at furniture and department stores, and $556.00 for a new diamond ring for his wife. 57 T.C. at 698. Nonetheless, one person's luxury can be another's necessi-

ty, and the lavishness of an expense must be measured from each family's relative level of ordinary support.[12] During the years in issue here the Sanders were apparently enjoying a fairly high and generally improving standard of living.[13] Thus, we cannot say as a matter of law that their expenses should have put Mrs. Sanders on notice of omissions from gross income. Yet in our opinion this case falls much closer to the line than Mysse does.

The district judge also compared Mrs. Sanders favorably to Mrs. Mysse with respect to the degree of her participation in the financial affairs of the family. On the whole we find little fault with his reasoning on this issue. It is worth noting, however, that although Mr. Mysse apparently was not generally secretive about his financial dealings, he derived his unreported income from embezzlement so difficult to uncover that the Tax Court characterized him as a "master of deceit." 57 T.C. at 698. Hence, it is likely that no amount of bookkeeping would have apprised Mrs. Mysse of her husband's peculations. Moreover, cases other than Mysse have found relatively little participation in the family's money matters sufficient to charge the spouse with knowledge of the omissions from gross income. Chanik v. C.I.R., 6 Cir. 1974, 492 F.2d 1182, aff'g, T.C.Memo 1972–174; Jerome J. Sonnen-

income. The court also noted that the husband "made no effort to ascertain the correct income of the family . . . ." and that there was "no showing that the books and records maintained by . . . [the wife] were not available to petitioner." Id.

Here the district court found as a fact that Mr. Sanders "did not confide financial matters to his wife and indicated, at several times, to friends that it was his policy not to do so." 369 F.Supp. at 163. Nevertheless, Charles requested Bettye to balance checkbooks and keep other financial records. These actions are inconsistent with an intent to conceal the sources and amount of the family income. This case is therefore distinguishable from Adams.

12. This follows naturally from the proposition that expenses for ordinary support cannot normally put the spouse on notice of omis-

sions from gross income. Patricia E. Mysse, supra, at 698.

We do not agree, however, with the implication in the district court's opinion that the absolute size of the reported income can alone be given much weight in making the reason to know determination. If annual reported income is either relatively constant or decreasing, rather than increasing, receipts in one year substantially in excess of reported gross income will raise the suspicion that some amount is going unreported whether the absolute size of the reported income is large or small.

13. During the years in question Charles Sanders moved from the practice of chiropractic to various positions with a number of pyramid sales marketing firms, including one of his own. In 1968 the couple reported gross income of $63,523.29. In 1969 they reported $36,087.38.

born, 57 T.C. 373, 381–82 (1971); Cecelia M. Harmon, T.C.Memo 1974–82; Schwartz v. C.I.R., T.C.Memo 1973–226. Admittedly, special circumstances—e. g., Bettye's emotional problems and the intricacy of Charles's finances—make this a stronger case for the spouse, but we approve no presumption that women in general are uninterested in or incapable of understanding financial affairs.

■ The district court also found that Bettye's emotional problems and heavy alcoholic consumption during the years in question impaired her ability to gain knowledge of the unreported income. Since we have agreed that subparagraph (B) must be interpreted in the light of the subjective position of the spouse claiming the benefits of § 6013(e), the state of the spouse's cognitive faculties becomes a permissible inquiry. We take care to point out, however, that different considerations would obviously apply where the evidence permitted the inference that the spouse intentionally turned a blind eye upon the financial activities of his or her marriage partner. *Cf.* Raymond H. Adams, 60 T.C. 300, 303 (1973).

Finally, in deciding that appellee had no reason to know of the omissions the lower court gave considerable weight to the complexity of Charles's finances and to the complicated and laborious method employed by the IRS to discover the unreported income. In this regard we think it would be worthwhile to deal with a distinction that we cannot be sure the district court clearly articulated. Certainly as to the actual existence of receipts in excess of those acknowledged for tax purposes it would be unreasonable in some circumstances to impute knowledge to the wife. For example, in

*Mysse* the Tax Court found "no reason why Patricia, a housewife without business knowledge, should have known more about . . . [her husband's long undiscovered embezzlements from the bank where he worked] than . . . businessmen having pecuniary or professional interests in the bank." 57 T.C. at 698. A different question arguably arises, however, when the issue is the tax consequences of admitted receipts. For example, the Tax Court has held that (e)(1)(B) was not satisfied when lack of knowledge is "predicated on mere ignorance of the legal tax consequences of transactions the facts of which are either in the possession of the spouse or reasonably within his reach." Robert L. McCoy, 57 T.C. 732, 734 (1972); Howard B. Quinn, 62 T.C. 223 (1974); *cf.* Herbert I. Joss, 56 T.C. 378 (1973). *But see* Altman v. C.I.R., 2 Cir. 1973, 475 F.2d 876, 879–80 (implying that a good faith belief that certain receipts were gifts rather than income might qualify a spouse under § 6013(e)(1)(B)). That is, the Tax Court apparently reads the statute to say that if a spouse knows or has reason to know of a transaction that the IRS later determines resulted in income to the couple, that spouse cannot claim the benefit of the innocent spouse provision even though he or she had no reason whatever to suspect that they had received taxable income.[14]

■ In this case the complexity of Charles's financial transactions clearly is a permissible consideration. Extremely intricate financial dealings could mask the existence of actual receipts as readily as did the manipulations of the defalcating husband in *Mysse*. The district judge relied upon this rationale only tangentially, however, while strongly em-

---

14. This is perhaps a permissible reading of § 6013(e)(1)(A)–(B) in light of Congress's general intent to extend relief only where equity demands it, but it is difficult to square with a literal reading of the statutory language. Subparagraph (B) mentions "such omission," which obviously refers back to (e)(1)(A) where omissions are described as "an amount *properly* included . . . ." (emphasis added). Since the propriety of including a given sum can finally be determined only by the IRS or the courts, subparagraph (B) seemingly makes ignorance of the fact that known receipts constitute taxable income a valid justification for not knowing or having reason to know of omissions from gross income. Nevertheless, the practical problems that have always prevented acceptance of an ignorance of the law defense in the criminal law area, *see* W. LaFave & A. Scott, Handbook on Criminal Law § 47, at 363–64 (1972), arguably apply just as forcefully here.

phasizing his reluctance to hold Bettye "responsible for deducing omissions from gross income under a rather esoteric method of accounting which apparently gave an experienced, capable and diligent revenue agent . . . considerable difficulties." 369 F.Supp. at 166. We do not view this reasoning as necessarily contrary to the Tax Court's position on the effect of ignorance of the tax consequences of known transactions. Nevertheless, we cannot fully approve it.

■ The bank deposits plus expenditures method used by the IRS agent here is employed when the taxpayer has "no regular method of accounting, or a method of accounting that does not clearly reflect his income." 369 F.Supp. at 162; 26 U.S.C. § 446(b) (1967). Mrs. Sanders played a significant role in maintaining tax records for the marriage. It would be anomalous to hold that she had no reason to know of omissions from gross income because she and Charles kept such incomplete or confusing records that the IRS required complicated methods to deduce the couple's true income situation. The Sanders's access to the facts of their own finances was much better than that of the IRS. The service used its complex accounting procedure in lieu of the more complete facts available to Charles and Bettye but not reflected in their written records. As a factual matter, then, we would give only slight weight to the intricacy of the procedure used by the IRS to detect the omissions.[15]

As the foregoing discussion reveals, we are not entirely comfortable with the district court's ultimate finding that Bettye Sanders met her burden of establishing that she had no reason to know of the omissions from gross income. We have concluded, however, that the judge applied the correct standards to the question and that the evidence nowhere compels a finding against appellee as a matter of law. Moreover, although disagreeing with the district court concerning the weight to be given some of the evidence, in view of all the circumstances of the case we cannot say that we are left with a definite and firm conviction that a mistake has been committed. The district court's finding that appellee qualifies under subparagraph (e)(1)(B) is not clearly erroneous.

### II.  Section 6013(e)(1)(C)

The Senate Report accompanying the bill that became 26 U.S.C. § 6013(e) makes clear that subparagraph (C) of that section "requires a *factual* determination . . . as to whether the spouse seeking relief from liability significantly benefited, directly or indirectly, from the items omitted from gross income." (emphasis added). *See* S.Rep.No. 91–1537, 1970 U.S. Code Cong. & Admin. News, pp. 6089, 6092. The report further notes, however, that:

> A mere finding that the spouse "benefited" from the items omitted from gross income will not be sufficient . . . to prevent that spouse from obtaining relief from liability for the tax. For the spouse to be prevented from obtaining relief there must also be a finding that the benefit was "significant" and that "taking into account all other facts and circumstances," it is not "inequitable to hold the . . . spouse liable for the deficiency in tax . . . ."

*Id.* The district court here concluded that Bettye Sanders had not significantly benefited from the unreported income but even if she had, it would still be inequitable to hold her responsible for the tax deficiency.

■ We have carefully examined the lower court's findings and conclusions on this issue, and we cannot say

---

15.  In Cecelia M. Harmon, T.C. Memo 1974–82 the Commissioner used the bank deposits method of reconstructing the taxpayer's income. During the tax years in question the husband ran an automobile repair business and the wife managed a grocery and liquor store. The court held that because the wife made out the bank deposit slips for bank accounts for both businesses, and because the husband took the slips to the bank, both knew or had reason to know of the omissions from gross income and were thus not entitled to the protection of § 6013(e).

that they are clearly erroneous.[16]  Congress manifestly intended that the weighing of the equitable considerations for and against charging an asserted "innocent spouse" with tax deficiencies be left largely to the informed judgment of the trier of fact.  The district court's opinion reflects a careful and conscientious review of appellee's financial situation.  Hence, we are loath to overturn his considered judgment that it would be inequitable to require Mrs. Sanders to pay these taxes.  Additionally, another circuit recently decided that it would be inequitable to require payment on facts substantially similar to those here.  Dakil v. United States, 10 Cir. 1974, 496 F.2d 431, 433.

Finding no error mandating reversal, we affirm the district court.

Affirmed.

16. The government urges that the district court also employed an erroneous legal standard in applying subparagraph (C).  Pointing to the undisputed fact that Mrs. Sanders received both the proceeds from an insurance policy that was increased from $50,000 to $145,000 during the period when the Sanders were underreporting their income and the proceeds from the sale of property acquired during the same period, the government argues that "Congress . . . did not intend to afford taxpayers any relief from joint liability, despite future hardship, if they retained unreported income or the fruits of unreported income which could be used to discharge the liability."  (Appellant's Brief at 18).

Taken literally, this argument is plainly contradicted by the language of (e)(1)(C), which enjoins the Commissioner and the courts to consider the presence of significant benefits from the unreported income as only one factor in the overall decision of whether it is equitable to charge the spouse with the tax.  Moreover, nothing in the statute or its legislative history purports to forbid the consideration of probable future hardship when examining the equities of the case.