RONALD JONES and MARJORIE JONES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jones v. Commissioner
Docket No. 2543-75
United States Tax Court
T.C. Memo 1977-51; 1977 Tax Ct. Memo LEXIS 388; 36 T.C.M. (CCH) 227; T.C.M. (RIA) 770051; March 2, 1977, Filed *388 Held, the amount of income realized by petitioner, Ronald Jones upon the cashing of certain checks determined. Held, the amount of gain realized by petitioner Ronald Jones on the sale of his club determined. Held further, petitioner Marjorie Jones qualifies for relief of tax liability under sec. 6013(e). Ronald Jones, pro se. Joseph M. Abele and Stephen R. Takeuchi, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1970 and 1971 as follows: Addition to tax Year
Deficiency
under Sec. 6653(a)
1970
$32,803.41
$1,640.17
1971
1,340.61
67.03 The issues for *389 decision are: (1) whether petitioner, Ronald Jones, was the ultimate recipient of the proceeds of certain checks which would render such funds income to him; (2) whether petitioner realized a gain on the sale of the Greater Pittsburgh Sportsmen's Club; and (3) whether petitioner Marjorie Jones qualifies for relief of tax liability under section 6013(e). Petitioners, Ronald and Marjorie Jones, husband and wife, resided in Beaver, Pennsylvania at the time they filed their petition herein. Petitioners filed joint Federal income tax returns with the internal revenue service, Mid-Atlantic Service Center, for the calendar years 1970 and 1971. Hereinafter petitioner will refer to Ronald Jones. During the years in issue petitioner was employed by Scenery Farms, Inc., a wholesale egg business owned by one John Petrone (hereinafter Petrone). He further performed various duties for and was secretary-treasurer of the German American Association of Allegheny County (hereafter GAA) Petrone's after hours club located in Pittsburgh. As secretary-treasurer petitioner's signature, as well as that of Petrone, was required to negotiate all GAA checks. The joint returns filed by petitioner *390 and Marjorie for the years in issue show the following items of income: 1970
1971
Wages
$10,200.00
$8,105.10
Dryfus Investment Dividends
90.60
145.49
Interest: Dollar Savings & Loan
510.00
558.51
Interest: W.P.N.B.
142.43
158.08
Capital Gain
45.61
2,812.50
Rent: 30 River Road
1,800.00
1,850.00
Rent, 358 Beaver Street
1,500.00
1,500.00
Gambling winnings
3,552.19
--
Other income
--
9,206.00
A majority of the aforenoted items constituted income of petitioner rather than Marjorie. Although no breakdown appears for 1970 wages, only $105.10 of reported wages in 1971 were earned by Marjorie. It is not clear whether the dividends were those of petitioner or Marjorie but on her separate 1972 income tax return Marjorie reported dividends from Dryfus while petitioner, on his separate 1972 return, did not. The two savings accounts were in petitioners' joint names as was their rental house at 30 River Road. The house at 358 Beaver Street was petitioners' personal residence. The third floor thereof was leased to Mr. and Mrs. Charles Semenick during the years in issue. The rent therefrom was paid directly to Marjorie. Petitioner managed *391 his household in patriarchal fashion. He told Marjorie little, if anything, about his activities including his business affairs. Consequently, Marjorie was never informed about the amount of income earned by petitioner and did not take part in the preparation of the joint returns for the years in issue. These returns were prepared by Alex B. Possino and petitioner signed them for both Marjorie and himself. In October, 1970 the GAA building and its furnishings were destroyed by fire. Pursuant to the insurance policy the Penn State Mutual Insurance Company issued checks in the amounts of $60,000 and $100,000 payable to GAA, Ronald R. Jones, Sec. Treas., John A. Petrone, Mgr., Carl Luick, Public Adjuster. These checks were deposited in the GAA checking account at the Iron and Glass Bank, Pittsburgh, Pennsylvania on October 21, 1970 and October 23, 1970, respectively. [1]
GAA check number 121 in the amount of $10,000, dated October 29, 1970 and signed by both petitioner and Petrone, was made payable to the order of petitioner. *392 Petitioner endorsed this check and cashed it at the bank in the company of Petrone. During late October, 1970 Sam Weiss (Weiss) at petitioner's behest traveled from Ambridge, Pennsylvania to Pittsburgh in order to cash a check for petitioner. Near Pittsburgh petitioner and Weiss were met by Petrone who accompanied Weiss to the Iron and Glass Bank. Petitioner did not go to the bank. In the bank Petrone handed Weiss GAA check number 115 in the amount of $10,000 payable to the order of Sam Weiss. [2] The check was endorsed by both Petrone and Weiss. Weiss then cashed the check and, upon returning to Ambridge, gave the check proceeds to petitioner who then gave him $1,000. GAA check number 124 in the amount of $7,500 was dated October 29, 1970 and was signed by Petrone and petitioner. It was made out to the order of Economy Furniture, a business owned by Weiss who cashed it at petitioner's request and turned the proceeds over to petitioner. In return for cashing this check petitioner gave Weiss $750. In the latter part of 1970 Ernest Gengarella (hereinafter Gengarella) was in need of *393 funds which petitioner offered to supply. Petitioner and Genarella drove to Pittsburgh where Gengarella was introduced to Petrone and GAA check number 131 was obtained. This check in the amount of $10,275.98, signed by Petrone and petitioner and dated November 13, 1970, was payable to the order of the Gengarella Construction Co., Inc. Petitioner and Gengarella went to Beaver, Pennsylvania where Gengarella cashed the check and turned the proceeds over to petitioner. Petitioner then lent $5,000 to Gengarella who repaid the loan in March of the following year. Petitioners, on their 1970 return, did not report as income the proceeds of any GAA checks. Respondent determined that petitioners had realized income from the aforenoted checks in the amount of $36,775.98. [3]
In 1971 petitioner sold his interest in the Greater Pittsburgh Sportsmen's Club to James Matire for $32,000. The sale was not reported on petitioners' return for that year. Respondent determined that the sale resulted in *394 the recognition of long term capital gain in the amount of $11,167, arrived at as follows: Sales price
$32,000
Adjusted basis
20,833
Gain
$11,167
During the years in issue petitioners made various expenditures, acquisitions, and dispositions other than for normal support items. Such expenditures are set forth below. (1) Petitioners purchased 500 shares of stock in Health Industries, Inc. as joint tenants on March 3, 1971 for $3,963.75. The sale of this stock was subsequently reported on Marjorie's separate 1972 return which shows a sales price of $4,927.75. [4]
(2) Petitioners purchased 6,000 shares of Rolls Royce, Ltd. in 2,000 share lots on April 12, April 29, and May 20, 1971 for $640, $800 and $1,160, respectively. Petitioners sold the 6,000 shares on June 9, 1971 for $1,740 less a broker's commission of $120. The sale was not reported on their 1971 return. (3) In 1971 petitioners made total deposits in the amount of $805 in their joint account at W.P.N.B. (4) Petitioner acquired 38 shares of S. & J. Advertising Company, Inc. in December, 1971 for which he paid *395 $5,600 in cash.He transferred this stock to Marjorie on February 12, 1972 in order to conceal his involvement with the company from an investigating commission looking into gambling activities.
OPINION Issue 1. Taxability of the Check Proceeds. During 1970 petitioner caused four GAA checks to be cashed, one which he himself cashed and three of which were cashed by acquaintances. Respondent takes the position that petitioner was the ultimate recipient of the proceeds and that the proceeds constitute income to petitioner. Petitioner, to the contrary, asserts the following sequence of events transpired pertaining to the tracing of the proceeds in issue: (1) Checks 121 and 115: Petitioner contends that he was a mere conduit and that Petrone received the proceeds therefrom except for a $1,000 commission to Weiss for cashing check 115. (2) Check 124: Petitioner contends that of the $7,500, Weiss received $750 for cashing the check; $4,250 was given to Petrone; and the balance was retained by Weiss in payment for furniture. (3) Check 131: Petitioner concedes that he ultimately received $5,000 from this check but contends that Petrone received the balance. This issue *396 is entirely factual and could well be entitled "The Case of the Disappearing Funds". Unfortunately Watson has not seen fit to chronicle the case for us and the resolution is not as elementary as Holmes would have it. Respondent's witnesses testified regarding the circumstances surrounding the various check cashings which were in large part admitted by petitioner. Petitioner, testifying on his own behalf, sought to penetrate the shroud covering the missing funds by claiming that, once Weiss and Gengarella were offstage, he relinquished the proceeds to Petrone. Obviously the outcome rests upon petitioner's credibility. During the trial petitioner, while testifying, was evasive and portrayed himself as less than a pillar of virtue. Consequently we cannot accept his testimony in its entirety. We do note that, in a pure credibility situation such as this, the trier of fact can never be certain about his conclusion. However difficult the task, the matter must be resolved. Thus while it is possible that petitioner was telling the truth with respect to the disposition of the funds, in view of the presumption of correctness accorded to respondent's determination, the indirect testimony *397 and evidence of others, and petitioner's admittedly less than exemplary character, we hold against him on this issue. We except from the foregoing statement the amount of $750 from check No. 124 which we find was paid to Weiss. As we view the cast of characters who testified in this case, we find it incredible that Weiss would have gone to the trouble he did to cash that check solely out of friendship for petitioner. [5]
Issue 2. Gain on the Sale of the Club. Respondent contends that in 1971 petitioner sold the Greater Pittsburgh Sportsmen's Club in which he had an adjusted basis of $20,833 for $32,000. Petitioners' position on this issue is not at all clear. In the petition they admit receiving $32,000 in 1971 for the Club but allege they had an adjusted basis of $45,000. At trial petitioner through his accountant intimated that $9,000 of the sales proceeds was received and reported in 1972. In either event petitioners have failed to prove either of these contentions and respondent's determination on this issue is hereby sustained. *398 Issue 3. Marjorie's Liability for Tax. The final issue is whether Marjorie qualifies for relief of tax liability under section 6013(e), I.R.C., 1954. [6] The burden of proving each of these elements is on petitioners. Raymond H. Adams,60 T.C. 300 (1973). The parties agree that the 25 percent test set forth in subparagraph (1)(A) has been satisfied. Respondent contends that Marjorie knew or had reason to know of the omissions, that she significantly benefited therefrom, and that it would not be inequitable to hold her8liable. Petitioners, of course, contend otherwise. *399 The first element is whether Marjorie, "in signing the return" [7] Knew, or had reason to know, of the omissions. We think not. As noted previously petitioner ran the family with an iron hand and controlled the family budget. Marjorie did not participate in petitioner's business affairs. See Sanders v. United States,509 F. 2d 162 (5th Cir. 1975). Financial matters were not a topic of discussion between petitioner and Marjorie as is evidenced by petitioner's signing and filing returns for the years at issue without so advising her. Further, in light of the nature of petitioner's activities that produced the omitted income, many of which were outside the scope of the law, petitioner's nondisclosure does not strike us as peculiar. *400 Moreover, petitioners incurred no unusual expenditures that would have alerted Marjorie. No sudden rise in petitioners' standard of living took place as a result of the omissions. Patricia E. Mysse,57 T.C. 680 (1972). Further, no lavish presents were bestowed upon her. Sanders v. United States,supra.
In this connection respondent attributes knowledge, or reason to know, on Marjorie from the investments made by petitioners in 1970 and 1971. However, in light of her ignorance of the family's finances she could not know that such acquisitions were made with the unreported funds. Patricia E. Mysse,supra.In fact not only is there an absence of evidence concerning the source of the investment funds, but there is nothing in the record to indicate that the family unit overspent its current income. Under these circumstances we conclude that Marjorie did not know, and had no reason to know, of the omissions. The second element is whether, taking into account whether or not Marjorie significantly benefited from the omitted items, it would be inequitable to hold her liable for the deficiency attributable to such items. *401 The Senate Report relating to section 6013(e)(1)(C) indicates that the term "benefit" does not include ordinary support of the so-called innocent spouse but that it does include unusual support or transfers of property. S. Rept. No. 91-1537, 91st Cong., 2d Sess. (1970), 1971-1 C.B. 606-608. Respondent contends that the investments and the bank deposits noted in our findings of fact conferred a significant benefit upon Marjorie. We disagree. After a careful consideration of the record we think it clear that, except possibly for the stock in Health Industries, Inc., petitioner and not Marjorie controlled the family funds and investments. In fact we cannot find that Marjorie had access to the omitted items of gross income. Neither Marjorie nor respondent was able to trace the funds in issue. Therefore, there is apparently no accumulation from which she can benefit in the future. Patricia E. Mysse,supra.
Concededly, Marjorie did benefit from the sale of the stock in Health Industries, Inc. We do not know the source of founds used to purchase such stock and hence cannot say with certainty that the stock was not purchased with unreported income. *402 However, under the facts and circumstances of the instant case, we think it inequitable to hold Marjorie liable and find that she falls within the ambit of section 6013(e). Decision will be entered under Rule 155. Footnotes
1. Petitioner was convicted of using the mail to defraud Penn State Mutual Insurance Company in connection with the fire and the concomitant claims.↩
2. This check, dated October 23, 1970, was signed by both Petrone and petitioner.↩
3. Respondent also determined that petitioner had realized income from the proceeds of three other GAA checks but on brief concedes that his determination was, in this respect, erroneous.↩
4. The broker's check was payable to Ronald R. Jones and Marjorie A. Jones.↩
5. In this respect we accord the same treatment to the $750 payment as respondent did for the $1,000 payment out of check No. 115.↩
6. SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General.--Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.↩
7. As noted in our findings she did not actually sign the return. However, in light of her ratification of the return as a valid joint return this section is not inoperative. The phrase in signing the return merely signifies the time reference upon which we must focus. In the present context this translates into an examination of Marjorie's actual knowledge or what she had reason to know at the time petitioner signed the returns for her.↩