ROY A. COX, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cox v. Commissioner
Docket No. 6958-80.
United States Tax Court
T.C. Memo 1982-723; 1982 Tax Ct. Memo LEXIS 23; 45 T.C.M. (CCH) 333; T.C.M. (RIA) 82723; December 15, 1982. Roy A. Cox, Jr., pro se. Paul G. Topolka, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner, in a joint statutory notice, determined a deficiency of $13,623.75 and addition to tax of $681.19 under section 6653(a)[1] on petitioner's Federal income tax return for the taxable year 1976. The sole issue before the Court is whether petitioner should be relieved from liability for the deficiency and the addition to tax under the "innocent spouse" provisions of section 6013(e) with respect to the taxable year 1976. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and attached *24 exhibits are incorporated herein by this reference. Petitioner Roy A. Cox, Jr., resided in Greensboro, North Carolina, when he filed his petition with this Court. Petitioner filed a joint Federal income tax return with the Internal Revenue Service Center, Memphis, Tennessee. A joint statutory notice of deficiency was issued to petitioner and his then-spouse, Vickie P. Cox (Vickie) for taxable year 1976. Petitioner's former spouse, Vickie, did not file a joint petition or a separate petition with the Court from the joint statutory notice and accordingly is not a party to this proceeding. Petitioner and Vickie were married in 1973 and divorced in 1979. The couple owned a house, stereos, several cars, a motorcycle, and had money in the bank. They had obtained low-interest loans from Jefferson-Pilot Credit Union to finance consumer items and, in general, enjoyed a relatively comfortable standard of living. Vickie was employed by Jefferson-Pilot Fire and Casualty Company (Jefferson-Pilot) in Greensboro, North Carolina, from 1973 to 1977. Prior to this employment, she completed two years of college at the University of North Carolina at Greensboro. Petitioner never finished *25 high school. He was unable to hold a permanent job. He has a history of mental and emotional illness dating back to childhood. It manifested itself in the form of violence, nervousness and depression. Psychological tests administered by his physician showed him in 1975 to be borderline schizoid, possessing problems dealing with reality and experiencing episodes of breaking with reality. Petitioner, at 6 feet, 5-1/2 inches, weighed only 150 pounds when he went to Dr. Johnson in 1975. Petitioner felt that his "mind was burning up his body." He could not stay seated, he could not sleep, could not concentrate. His temper would get completely out of control. In a crowded department store, a man accidentally bumped into petitioner. Petitioner then struck the man for no apparent reason. This type of behavior dated back to childhood. Petitioner's outbursts put stress on his marriage and it was at his family's urging that he sought psychiatric counseling. He was prescribed sedatives as part of the treatment. Dr. Johnson placed him on Etrafon-Forte, a medication that combines both an anti-depressant and a major tranquilizer to help bring his symptoms under control. Petitioner *26 took three of these tablets every night at bedtime. The soothing and calming effect of the medication gave petitioner a druginduced sense of well being. The medication worked so well that nothing concerned him anymore, he did not worry about anything. He was a different person. There was, however, at least one incident of a blow-up within a month after petitioner started his medication and he returned to the doctor. Petitioner was still having difficulty sleeping, so Dr. Johnson added a sleeping capsule which petitioner took in addition to the other three capsules. He continued his medication for the next two years. Between January and March 1977, petitioner, complaining of lower back pain, went to another physician. This doctor felt that petitioner demonstrated significant anxiety, sufficient to warrant continuation of what he regarded as a very strong tranquilizer medication. Petitioner experienced fluctuations in his moods ranging from violence to a drug-induced sense of well-being. Because of a lack of success in treating petitioner's lower back problems, this second doctor prescribed Tylenol No. 3, which contains codeine, and also gave petitioner a prescription for *27 Valium which has a more-recognized muscle relaxant than Etrafon. Vickie was arrested on August 10, 1977, and charged with embezzlement from her employer, Jefferson-Pilot, during the years 1975, 1976 and 1977. At the time of her arrest, Vickie had in her possession $8,762 in cash and two checks payable to her from Home Federal Savings and Loan in the amounts of $4,222 and $2,450. Upon Vickie's arrest for the embezzlement in August 1977, petitioner was interrogated by police as to his involvement in the crime. His demeanor was that of someone taking strong medication. He was polite, but unable to talk. The criminal charges filed against him were dropped after it was determined he did not know about or take part in the embezzlement scheme. From 1975 to 1979, including the taxable year in issue, petitioner lacked the mental capacity to comprehend events taking place around him due to his dependence on strong doses of medication. The embezzlement scheme that Vickie employed was to prepare checks representing premium refunds payable to numerous fictitious payees. She would then endorse the name of the fictitious payee and deposit the funds in a joint bank account using a fictitious *28 joint owner's name of either Sue White or Mary E. Woods, together with her name. Sometimes she deposited the funds in another account she maintained in her own name. She often made night deposits and carried some of the money in her clothes. She began her crime on February 18, 1975, and continued until August 9, 1977, the day before her arrest. During those years, Vickie embezzled the following amounts from Jefferson-Pilot: Year
Amount
1975
$ 8,841.44 1976
42,043.51 1977
115,900.00 $166,784.95 less 1977 unrecovered
checks
(14,732.00)
$152,052.95 The following bank accounts were used principally as depositories for the embezzled funds: Total
Balance as
Total
Disbursements
of
Deposits
or Withdrawals
8/4/77
Wachovia Checking Account
No. 6-272-465
Opened September 25, 1975
Mrs. Vickie P. Cox
Mrs. Sue White
$ 81,283.19
$ 71,287.08
$ 9,996.11
Wachovia Checking Account
No. 0-272-468
Opened March 23, 1976
Vickie Pitts Cox
20,335.94
19,508.11
827.83
Balance as of
7/29/77
Gate City Savings & Loan
Assoc. Savings Account
No. 952, 926-5
Opened September 5, 1975
Mrs. Vickie P. Cox or
Mrs. Mary E. Woods
53,811.70
49,130.73
4,680.97
$155,430.83
$139,925.92
$15,504.91
*29 During 1976, disbursements, withdrawals and checks written by Vickie from her accounts were as follows: Wachovia Checking Account
No. 6-272-465
$15,299.75
Wachovia Checking Account
No. 0-272-468
10,720.90
Gate City Savings & Loan Assoc.
Savings Acct. No. 952, 926-5
11,054.56
Community Bank of Carolina
Vickie's checking acct. No. 150-337-5
1,799.79
$38,875.00
Petitioner and Vickie had two joint savings accounts from 1975 until 1977. During 1976 petitioner withdrew $1,655 from one account and $1,075 from the other. Petitioner maintained a separate checking account at Community Bank of Carolina from January 1, 1976, until October 11, 1976. Total deposits to petitioner's account at this bank were $3,657.21 exceeding his take home pay by $1,976.21. After October 11, 1976, there was no need for petitioner to maintain a checking account of his own because by this point Vickie had taken over all financial matters and gave him pocket money to pacify him because of his mood swings. Petitioner had no idea how much money his wife took home from her job. Vickie told him that she had sold some stocks and bonds. As late as February 17, 1977, petitioner *30 still did not know that his wife was embezzling money from her employer. When petitioner signed their 1976 joint Federal income tax return on March 1, 1977, he did not know of the omitted income. Vickie used the embezzled money primarily for two purposes. In 1976, Vickie spent a total of $1,855.51 on household goods and improvements to the residence and $3,923.12 for improvements in 1977. She used most of the money, however, in a pathetic attempt to set up petitioner in an exotic bird and animal business. Between 1976 and 1977, Vickie became obsessed with the idea of this business and spent approximately $100,000 of the embezzled money purchasing exotic birds and animals, feeding them and traveling to exotic animal conventions. She also purchased and took title, in her name only, to a 1977 van intended for use in the business. Petitioner exhibited no ability to run a business of this kind, yet Vickie continued her obsession for at least nine months after it became abundantly clear that because of petitioner's mental and emotional problems he lacked the interest and capacity to go into this or any other business. Vickie told petitioner that she had obtained a business loan *31 from her credit union, had her other loans there consolidated and sold some stocks and bonds (which he knew she owned) in order to finance the bird business. Petitioner believed and trusted his wife. He had no idea that she was stealing money and thought the money was a business loan. Because of his mental and emotional condition, petitioner played an extremely subservient role in all financial matters and had virtually no will of his own. Petitioner lacked the ability to contribute in any meaningful way to the start-up of this business. The business never got any further than the purchase of the animals. In October, following Vickie's arrest, petitioner had his grandmother purchase for him a 1977 Corvette. The money came directly from the sale of birds returned to petitioner by Jefferson-Pilot's insurer and from the sale of another car belonging to petitioner. In the end, the car and most everything in petitioner's home was either sold at auction or impounded by the insurance company toward repayment of the embezzled money. Petitioner was left with nothing. In 1979 he had a complete breakdown. ULTIMATE FINDINGS OF FACT (1) Petitioner has a history of mental illness, *32 unemployability and is possessed of little education. (2) Petitioner was diagnosed a borderline schizophrenic and from 1975 to 1979 exhibited characteristics such as passivity, withdrawal, depression and personality deterioration. He was taking strong tranquilizer medication which created a false sense of euphoria and contributed to his already diminished capacity to comprehend events taking place around him. (3) When petitioner signed the 1976 joint Federal income tax return on March 1, 1977, he did not know of the omitted income nor did he have reason to know of it. (4) To the extent petitioner received any benefit from the omitted income, it was not significant. OPINION Section 6013(e) provides that in certain circumstances a spouse who has filed a joint Federal income tax return will be relieved from liability to the extent that such liability results from omissions of gross income attributable to the other spouse. In order for petitioner to qualify for the relief provided by the statute, the following statutory conditions must be satisfied for the taxable year in issue: *33 SEC. 6013(e). SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.-- (1) IN GENERAL. Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return. (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from *34 gross income. The first requirement of section 6013(e)(1)(A), with respect to the omission of income is not at issue. The parties stipulated that the $42,043.51 of embezzled funds were in excess of 25 percent of the amount of gross income stated in the joint Federal income tax return and were attributable solely to petitioner's former spouse. All three statutory requirements, however, must be satisfied and it is the remaining two requirements of section 6013(e)(1)(B) and (C) that respondent contends petitioner has failed to meet. Adams v. Commissioner,60 T.C. 300 (1973); Estate of Jackson v. Commissioner,72 T.C. 356, 360 (1979). Petitioner has the burden of proving that all three requirements are satisfied. Rule 142(a), Tax Court Rules of Practice and Procedure; Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). I. Section 6013(e)(1)(B)
This subsection requires petitioner to establish that he did not know or have reason to know *35 of the omission of gross income when he signed the return. In order to do this, he must prove (1) that he did not have actual knowledge of the omission, and (2) that the omission was not of such character as to cause a reasonably prudent person possessed of petitioner's experience and temperament to have known of the omission. The above determinations are questions of fact. Sanders v. United States,509 F.2d 162, 165, 167 (5th Cir. 1975); Mysse v. Commissioner,57 T.C. 680, 697-699 (1972). Both petitioner and Vickie testified as to whether petitioner actually knew of the omission. Petitioner testified that he did not know: I had no idea earthly [sic] that she was taking the money. * * * [It was] [m]y understanding that she had got a business loan from Jefferson Pilot Fire and Casualty Credit Union, which we had used a number of times to buy cars with a low interest rate. And she led me to believe that she had been buying stock. * * * And I had no idea earthly [sic] that she was embezzling money. That is my solemn word. You just don't look at your wife and think that she's an embezzler or a crook. And I never did look at it that *36 way. Vickie's testimony as to petitioner's actual knowledge, however, was conflicting: Q. Did Mr. Cox question you during 1976 as to how you obtained this money to purchase this multitude of birds and exotic animals? A. He had. Q. He questioned you? What was your response? A. In the beginning it was none of his business. Q. And in the end? A. He knew where it was coming from. Q. He knew the source of the funds? A. Yes. Q. Jefferson Pilot Fire and Casualty Co.? A. Well, that's where it would have to come from. Q. Yes. A. That's the only place I worked. Then on cross-examination by petitioner: Q. Just give me a yes or no.Did you or did you not say that you had got a business loan from the Credit Union? A. I said in the beginning when you asked me * * * I told you I had stocks and bonds. Also on direct examination, however, Vickie testified as to whether petitioner knew by February 17, 1977, where the money was coming from: Q. Okay. Did Mr. Cox at that time have an understanding where that amount of money was coming from, the source of that money? A. Not really. Vickie has not contested this tax deficiency against *37 her, and if petitioner is not held liable and not required to pay some or all of the tax, Vickie will likely have to pay it. We have carefully reviewed the testimony given by both Vickie and the petitioner as well as the testimony of other witnesses. The testimony of the other witnesses corroborates petitioner's testimony. Considering the demeanor of the witnesses and the substance of their testimony, we believe petitioner and not Vickie. Accordingly, we find that he did not possess actual knowledge of the omission of income during the taxable year or at the time of signing the joint return. We now look at whether the petitioner had "reason to know" of the omission. This is the second part of the section 6013(e)(1)(B) test. In Sanders v. United States, supra, an "innocent spouse" case, the Court of Appeals for the Fifth Circuit, analyzed the proper standard for determining whether a spouse without "actual knowledge" had "reason to know" of the omission.In the context of this analysis the court considered whether the district court below had properly considered the emotional problems and heavy alcoholic consumption of the taxpayer and how this impaired her *38 ability to gain knowledge of the unreported income. The Court of Appeals stated: Since we have agreed that subparagraph (B) must be interpreted in light of the subjective position of the spouse claiming the benefits of [sec.] 6013(e) the state of the spouse's cognitive faculties becomes a permissible inquiry. [Sanders v. United States,509 F.2d 162, 169 (5th Cir. 1975).] The court in Sanders interpreted the "reasonably prudent taxpayer" test as including consideration of the taxpayer's subjective condition when assessing the reasonableness of his actions. The court elaborated that the "reason to know" determination involved not just inferences about taxpayer's subjective position as revealed by his demeanor at trial but secondary inferences drawn from the primary findings of fact. Sanders v. United States,supra at 167 n. 8. In assessing the reasonableness of petitioner's actions under the "reason to know" test, therefore, we will consider the *39 effect of petitioner's mental illness and his reliance on heavy tranquilizer medication on his ability to gain knowledge of the unreported income. We begin our analysis by taking judicial notice of the fact that the term "schizoid" [2] refers to (1) a personality disorder marked by dissociation, passivity, withdrawal, depression, and autistic fantasies, or (2) schizophrenia--a psychosis marked by withdrawn, bizarre and sometimes delusional behavior and by intellectual and emotional deterioration. This is an accurate description of petitioner's condition as portrayed by the witnesses at trial. Petitioner was diagnosed by his own doctor as being borderline schizoid. Next we will examine three factors that we have considered significant in prior cases in deciding whether a spouse had reason to know of omissions from gross income: (1) Unusual or lavish expenditures; [3] (2) participation in business affairs or bookkeeping; [4] and (3) the "guilty" spouse's refusal to be forthright about the couple's income.[5]
*40 Respondent argues on brief that the following scenario constituted "lavish" and "unusual" expenditures and should have alerted petitioner to the existence of the omitted income. Vickie paid some of petitioner's debts; Vickie made the monthly mortgage payment on the house of $220; she gave petitioner spending money and made improvements to their residence. Respondent also argues that the expenditures for the exotic animal business and the fact that Vickie took title, in her own name, to the 1977 van purchased for the business should have alerted petitioner to the fact that the business money was not a loan at all. Prior to the embezzlement, petitioner and Vickie seemed to enjoy a relatively comfortable standard of living. They owned a home, several cars, a motorcycle, stereos and had money in the bank. They had also used the Jefferson-Pilot Credit Union many times in the past to finance low-interest loans. Vickie herself spent $1,855.51 on household goods and improvements to the residence in 1976 and $3,923.12 in 1977. We are not convinced that these facts are sufficient to alert petitioner to the larger amounts of omitted income. Apart from the money spent on the animals, *41 which we have found petitioner believed was a business loan, the money petitioner came into contact with in his two savings accounts, [6] his personal checking accounts, plus the spending money Vickie gave him, was not lavish or unusual in comparison with the lifestyle to which he was accustomed. Even absent the serious mental illness, these facts alone might not have alerted a spouse with petitioner's lack of education and total dependence on his spouse to handle business matters. Considering these facts against the back-drop of petitioner's exhibited subjective condition, his passivity, withdrawal, depression, intellectual and emotional deterioration, we are not convinced by respondent's argument that this petitioner should have had reason to know of the omitted income. Next we look at petitioner's participation in business affairs or bookkeeping. Petitioner did not know how much money Vickie had or took home from her job. He took no part in handling family financial matters. Vickie purposefully kept information from him and testified that she gave him pocket money to "pacify him * *42 * * as to his moods." Respondent says that because petitioner received a $220 check drawn on one of Vickie's Wachovia accounts which he endorsed and deposited in his checking account that this should have alerted him to the existence of another account, thereby causing him to know of the omitted income. Because of his psychological problems, petitioner played a passive role in all financial matters. We cannot find that because of his endorsement of this $220 check petitioner would have had reason to know of the other income. The final factor to consider in our determination of whether petitioner had reason to know of the omission from gross income is the "guilty" spouse's refusal to be forthright about the couple's income. Vickie's testimony throughout the trial shows that she deliberately kept the actual source of funds from petitioner. In order to conceal her crime she took over all financial matters. She made secret night deposits and carried large amounts of cash in her clothes. She lied to petitioner. In his drug-induced euphoria, petitioner trusted his beloved wife to take charge of his life. We conclude that the evidence on the above factors weighs in favor of the *43 petitioner and that he did not have reason to know of the omission of income. Petitioner has met his burden of proof with respect to both section 6013(e)(1)(B) tests. II. Section 6013(e)(1)(C)
The Senate Report accompanying the bill that became 26 U.S.C. section 6013(e) makes clear that paragraph (C) of that section "requires a factual determination * * * as to whether the spouse seeking relief from liability significantly benefited, directly or indirectly, from the items omitted from gross income." [7]
The report notes further, however, that: A mere finding that the spouse "benefited" from the items omitted from gross income will not be sufficient * * * to prevent that spouse from obtaining relief from liability for the tax. For the spouse to be prevented from obtaining relief there must also be a finding that the benefit was "significant" and that "taking into account all other facts and circumstances," it is not "inequitable to hold the * * * spouse liable for the deficiency in *44 tax * * *." Under section 6013(e)(1)(C), then, it must be determined that it was "significant" and that "taking into account all other facts and circumstances" it is not inequitable to hold the spouse liable for the deficiency in tax. Benefit does not include ordinary support but, under section 1.6013-5(b), Income Tax Regs., does include unusual support or transfers of property to the spouse claiming section 6013(e) relief. The benefit does not have to be received in the same taxable year as the omission from gross income.A finding that the spouse seeking relief has benefited, however, is not enough to prevent "innocent spouse" status. Respondent argues that petitioner received significant benefit through the purchase of the numerous birds and exotic animals. Petitioner was clearly incapable of living up to Vickie's hopes for him of running a business. Vickie testified that he would have nothing to do with their care and feeding yet she persisted in her obsession with this bird business well beyond the point of obvious hopelessness. The business never got beyond the initial stage of the purchase of the birds and exotic animals. Petitioner lived *45 with almost 50 birds in a home that looked and smelled like one big bird cage. We see no benefit to petitioner in this, nor did he receive any benefit from the proceeds of the sale of these birds and animals. Respondent also points to the pocket money which Vickie gave to petitioner. The record is not clear exactly how much spending money petitioner received but even if she gave him $300 at a time we do not think that is unusual support. Resondent's final argument on the benefits issue concerns the cars petitioner purchased and the improvements made by Vickie to the home. Conspicuously omitted by respondent is the fact that all of petitioner's possessions were impounded and sold at auction shortly after Vickie's arrest. Even if there was benefit, it was short-lived. Nor do we see how petitioner received significant benefit, given his condition, from a patio railing, landscaping and a backyard fence. The other household items Vickie purchased were not significant. Accordingly, we find that petitioner received no significant benefit from the omitted income. Our final consideration is whether it would be inequitable to hold petitioner liable for the taxes. The term "inequitable" *46 as it appears in section 6013(e)(1)(C) is defined by the regulation as follows: (b) INEQUITABLE DEFINED. Whether it is inequitable to hold a person liable for the deficiency in tax, within the meaning of paragraph (a)(4) of this section, is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for the purposes of this determination. Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should have been included in gross income. Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefited from those items.Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking *47 relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse. [Sec. 1.6013-5(b), Income Tax Regs.] The government blithely ignores this aspect of the analysis. In Sanders v. United States,509 F.2d 162 (5th Cir. 1975), the Fifth Circuit noted that "nothing in the statute or its legislative history purports to forbid the consideration of probable future hardship when examining the equities of the case." Supra at 171 n. 16. Taking into account all the facts and circumstances, it would be inequitable to hold a borderline schizophrenic with a long history of mental illness, lacking a high school education, liable for these taxes. Petitioner has met his burden of proof under section 6013(e). Decision will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Random House College Dictionary, p. 1177 (rev. ed. 1982).↩
3. Mysse v. Commissioner,57 T.C. 680, 699↩ (1972). 4. Sonnenborn v. Commissioner,57 T.C. 373, 381-382↩ (1971). 5. Adams v. Commissioner,60 T.C. 300, 303↩ (1973).
6. During 1976 petitioner withdrew $1,655 from one account and $1,075 from the other.↩
7. S. Rept. 91-1537 (1970), 1971-1 C.B. 606↩, 607-608.