JOAN C. MANN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mann v. Commissioner
Docket No. 4783-89
United States Tax Court
T.C. Memo 1992-191; 1992 Tax Ct. Memo LEXIS 208; 63 T.C.M. (CCH) 2613; March 31, 1992, Filed *208 Decision will be entered for petitioner. Joan C. Mann, pro se. Mario J. Fazio, for respondent. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in and addition to petitioner's Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6661
1980
$ 37,142
--
1981
30,265
--
1982
32,307
$ 8,077
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issue we must decide is whether petitioner is entitled to relief from Federal income tax liability as an innocent spouse for the taxable years in issue. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulation of facts is incorporated herein by reference irrespective of any restatement below. Petitioner resided in Medina, Ohio, at the time she filed her petition. Petitioner's husband, William D. Mann, was an attorney who served in a fiduciary capacity for various clients in matters involving guardianships, trusts, and estates. *209 During the respective taxable years in issue, petitioner's husband embezzled $ 93,000, $ 65,000, and $ 71,000 from such clients (the embezzled funds). Petitioner and her husband filed joint Federal income tax returns for each of the taxable years in issue. The returns omitted the embezzled funds from gross income. Their 1980 return reported gross income in the amount of $ 33,421.04, business expenses in the amount of $ 3,757.91, Schedule A itemized expenses in the amount of $ 24,788.25, and taxable income in the amount of $ 4,874. Their 1981 return reported gross income in the amount of $ 53,245, business expenses in the amount of $ 4,329, Schedule A itemized expenses in the amount of $ 25,603, and taxable income in the amount of $ 19,313. Their 1982 return reported gross income in the amount of $ 65,213, business expenses in the amount of $ 5,431, Schedule A itemized expenses in the amount of $ 29,934, and taxable income in the amount of $ 25,192. During 1979, petitioner began having severe emotional and psychological problems. At her sister's request, petitioner began psychiatric treatment, which included psychotropic medication. Subsequent to the time petitioner began psychiatric *210 treatment, she discovered that her husband was involved in a relationship with another woman and that he had recently been involved in two other relationships. During August 1979, petitioner and her family moved from their five bedroom home to a smaller, less expensive home in order to reduce expenses. The sale of the home netted a $ 56,000 profit. After the move, petitioner was admitted to the psychiatric ward of Akron City Hospital and spent 8 weeks at the hospital. When petitioner was released from the hospital, in response to financial pressure and her husband's request, she began working as a full-time radio advertising salesperson. Prior to that time, petitioner, who had a degree in English from Wooster College, had worked as a part-time real estate agent but had not worked full time since her children were born. Petitioner, however, continued psychiatric treatment until sometime during 1982 when she terminated treatment for financial reasons. During the taxable years in issue, petitioner's husband deposited the embezzled funds into a joint checking account. The account was jointly held by petitioner and her husband, but was used primarily by petitioner's husband. Petitioner *211 and her husband maintained another joint account, which was used primarily by petitioner. Both accounts were held in joint names only for the purpose of emergencies. Consequently, petitioner and her husband used each other's account only on rare occasions. Petitioner's husband reconciled both checking accounts. Petitioner's husband prepared their returns for the taxable years in issue and presented the returns to petitioner for her signature at an inconvenient time for petitioner. Consequently, petitioner did not read the returns when she signed them. During the taxable years in issue, petitioner and her husband "constantly" argued about money. Petitioner's husband controlled the family finances, and even if petitioner disagreed with the financial decisions he made, she would do what he desired. Although petitioner paid family expenses for most food, a cleaning lady, some clothing expenses for the children and herself, laundry, drycleaning, and grooming costs for the children and herself, petitioner's husband paid for all other family expenses, including the mortgage and joint obligations. When petitioner questioned her husband about financial matters, he often told her of *212 his financial success in his law practice. On April 24, 1984, petitioner's husband told petitioner about the embezzled funds. Until then, petitioner did not know how much income her husband had embezzled or earned during the taxable years in issue. Petitioner's husband described himself as "a master of deception" and stated that he would take "every step necessary to conceal * * * [the embezzlement] from * * * [petitioner]". Petitioner trusted her husband and did not think he would be capable of embezzling money from someone. On December 14, 1979, petitioner and her husband obtained a $ 25,000 line of credit from BancOhio National Bank. Three days later, $ 16,000 was disbursed on the line of credit. [1] By February 1980, petitioner's husband had received additional disbursements of $ 9,000 reaching the $ 25,000 limit on the line of credit. On January 29, 1981, however, petitioner's husband was able to receive an additional $ 5,000, bringing the total amount of disbursements under the line of credit to $ 30,000. Originally, the BancOhio line of credit was unsecured, but the bank eventually required collateral to secure the debt and took a second mortgage on petitioner's home. *213 BancOhio eventually foreclosed on petitioner's home to satisfy the line of credit. On February 25, 1980, petitioner and her husband borrowed $ 9,000 from BancOhio National Bank and executed promissory note number 111902R which required payment in 92 days (May 27, 1980). The February 25, 1980, note was stamped "Paid by Renewal, June 17, 1980". The record does not reflect whether the February 25, 1980, note was ever paid. On May 26, 1981, petitioner and her husband *214 borrowed an additional $ 7,000 from BancOhio National Bank and executed promissory note number 18R which required payment in 90 days (August 24, 1981). The May 26, 1981, note was rolled over on August 24, 1981, and paid on November 23, 1981. On October 16, 1981, petitioner and her husband borrowed $ 6,500 from Commercial Credit Industrial Bank. During 1981 and 1982, petitioner's husband borrowed $ 1,275.94 and $ 1,025.82, respectively, against his life insurance policy. During the taxable years in issue, petitioner's husband borrowed the maximum amount on five or six credit cards and requested limit increases when he reached the maximum on certain cards. In 1980, petitioner discovered that her husband had been taking flying lessons and had already earned a pilot's license. During 1982, petitioner's husband purchased a one-third interest in an airplane, but he did not tell petitioner about the purchase. Although petitioner later discovered that her husband had a pilot's license, she thought he merely rented a plane when he flew somewhere. Petitioner did not know how often her husband flew, as he generally flew during working hours when she thought he was at work. Occasionally, *215 under pressure from her husband, petitioner flew in the airplane. During 1980, petitioner's husband paid $ 459 for a motor bicycle (moped) for the couple's daughter. He also paid $ 973.22 for ski equipment for himself and the couple's two daughters, financing the $ 900 of the purchase price over a 1-year period, and $ 422 for an air compressor. During 1981, petitioner's husband purchased a second moped for the couple's daughter, and paid $ 3,950 for a catamaran. During 1982, petitioner's husband paid $ 410 for season ski passes for himself and the couple's two daughters. He also purchased a new station wagon, financing $ 13,285.92 of the purchase price, and paid $ 1,800 for a used Volkswagen for the couple's daughter. Additionally, he paid $ 649 for a leaf blower for use at home, $ 700 for a camera, and $ 1,518 for dictating equipment. During the taxable years in issue petitioner and her husband charged purchases from Saks Fifth Avenue in the amount of $ 2,860. Petitioner and her family took vacation trips during the taxable years in issue. They went to Florida to visit petitioner's parents, purchasing inexpensive airline tickets and staying with her parents. During 1980 *216 and 1981, petitioner and her family drove to Holiday Valley Ski Resort and stayed for a weekend. During 1980 through 1982, petitioner and her family flew four times, in private aircraft, to Nags Head, North Carolina, where they stayed for long weekends. Petitioner's husband piloted the private aircraft. During 1981 and 1982, petitioner and her husband flew in a private aircraft, piloted by her husband, to Greenbrier Resort in West Virginia. Prior to the time petitioner's husband began embezzling funds from his clients, petitioner and her husband "lavishly" entertained. On one occasion in 1974, they hired a bus to pick up 45 of their friends, had cocktails on the bus, took everyone to dinner at a restaurant and then went rollerskating. On another occasion in 1975, they held a party at a friend's farm, inviting 200 guests for afternoon games, dinner, drinks, and a live band. In 1976, they held a catered wedding reception for petitioner's father-in-law at petitioner's home, inviting 150 guests for champagne, hors d'oeuvres, and a harpist. They hired a private airplane to fly to the East Coast to bring a special oil painting back for the dining room in time for the wedding reception. *217 During December 1978, petitioner and her husband held a cocktail party at their home, inviting approximately 150 guests to their home for an open bar and catered food served by hired help. On another occasion during that year, they held a road rally party at their home, inviting approximately 100 people. After January 1, 1980, their entertaining ceased. Petitioner filed a complaint for divorce from her husband during March 1985. Petitioner and her husband, however, were never divorced. Subsequent to the taxable years in issue, petitioner and her husband lost their home and the majority of their possessions due to foreclosures and financial difficulties. The embezzled funds have been spent. Petitioner does not have significant material wealth, she lives in a rented, two bedroom apartment. Petitioner works as a part-time clerk for $ 6.44 an hour, and her husband has worked on an assembly line for $ 4.75 an hour. OPINION Under section 6013(d)(3), spouses who file a joint income tax return are jointly and severally liable for the tax owed. However, liability may be relieved under section 6013(e)(1), [2] if certain requirements are met. Thus, if: (1) A joint return has been *218 made for the taxable year in issue; (2) on such return, a substantial understatement of tax attributable to grossly erroneous items of one spouse exists; (3) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, of the existence of such substantial understatement; and (4) after considering all facts and circumstances, holding the other spouse liable for the deficiency in tax attributable to such understatement would be inequitable; then the other spouse shall be relieved of liability to the extent such liability is attributable to such understatement. Estate of Krock v. Commissioner, 93 T.C. 672, 676-677 (1989). Petitioner has the burden of proof on all elements of section 6013(e)(1). Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986); Estate of Krock v. Commissioner, supra.
*219 In the instant case, the parties agree that the first two requirements of section 6013(e)(1) are satisfied. The parties do not agree, however, on whether petitioner knew or had reason to know of the omitted income and whether, under the facts and circumstances, it would be inequitable to hold petitioner liable for the income tax deficiency attributable to the understatement. We consider first whether petitioner knew of the omitted income. Petitioner testified that she did not read the returns when she signed them; her husband waited until the last minute to prepare their returns and then approached her at an inconvenient time and asked her to sign them. Petitioner also testified that she trusted her husband, that she did not know he was embezzling funds from his clients, and that she believed that he was incapable of such conduct. We believe petitioner's testimony, as well as that of her husband who described himself as a "master of deception" and stated that he took "every step necessary to conceal * * * [the embezzlement] from * * * [petitioner]". Accordingly, we hold that petitioner did not know of the omitted income from the embezzled funds. We next consider whether petitioner *220 had reason to know of the omitted income from the embezzled funds when she signed the returns. The standard is whether a reasonably prudent person with knowledge of the facts should have known of the omitted income at the time the return in question was signed. Shea v. Commissioner, supra at 566; Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979); Mysse v. Commissioner, 57 T.C. 680, 699 (1972). The issue is a question of fact. Shea v. Commissioner, supra.
Respondent contends that petitioner had reason to know of the omitted income because her family's expenditures "far exceeded" its taxable income and that petitioner should have discovered the discrepancy after reviewing the income tax returns. We do not agree. The fact that petitioner signed the returns in question without reading them does not require the conclusion that she would have had reason to know of the omitted income if she had read them. The income petitioner and her husband reported for the years in issue, along with the $ 56,000 profit from the sale of their home in August 1979, the $ 16,000 they borrowed on December 17, 1979, *221 and the funds they borrowed from banks and credit cards during the years in issue were sufficient to provide petitioner and her husband with a reasonably comfortable standard of living. See Terzian v. Commissioner, supra at 1171; Feingold v. Commissioner, T.C. Memo. 1980-163. Although petitioner's husband purchased, with petitioner's knowledge, vacations, vehicles, and equipment during the taxable years in issue, we do not find such purchases to be beyond what a reasonable person would have perceived the family's resources and standard of living to be. Other significant factors in determining whether a spouse had reason to know of the omitted income are: (1) Unusual or lavish expenditures, Mysse v. Commissioner, supra at 699; (2) participation in business affairs or bookkeeping, Sonnenborn v. Commissioner, 57 T.C. 373, 381-382 (1971); and (3) the other spouse's refusal to be forthright about the omitted income, Adams v. Commissioner, 60 T.C. 300, 303 (1973). To qualify as an innocent spouse, the person claiming innocent spouse status "is not required to have perfect knowledge *222 of the family's finances * * *; however, she cannot close her eyes to unusual or lavish expenditures." Mysse v. Commissioner, supra.
A minimal involvement in the family's financial affairs can satisfy the reason to know standard. Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986) (citing Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975)), affg. in part and revg. in part T.C. Memo. 1984-310. In Shea, the Sixth Circuit held that the taxpayer was not an innocent spouse because she had reason to know of the omitted income. She had been involved in her husband's corporation as secretary- treasurer, was authorized to write corporate checks, and made deposits to the corporate account at her husband's direction. Shea v. Commissioner, supra at 563-564. Additionally, corporate checks had been issued for nonbusiness purposes to the order of the taxpayer, her husband, cash, and other payees on their behalf. The taxpayer's husband also used the taxpayer's checking account without her permission but with her knowledge, and the taxpayer's husband controlled the reconciliation *223 of the bank statements for such account each month. Shea v. Commissioner, supra.
In Sonnenborn v. Commissioner, 57 T.C. at 374-376, the taxpayer and her husband each owned 50 percent of a corporation. The taxpayer's husband was president of the corporation, and the taxpayer was its treasurer. The taxpayer was not active in the management of the corporation, although she did devote some time to its affairs. The taxpayer was authorized to sign corporate checks, and, occasionally, she signed checks when her husband was unavailable. Every week the taxpayer's husband gave the taxpayer a $ 900 corporate check to deposit into her personal checking account for household and living expenses. Additionally, the corporation made payments to a personal loan account. The Court held that the taxpayer had reason to know of the omitted income and did not qualify as an innocent spouse because of the weekly $ 900 corporate check and her status as treasurer of the corporation. The instant case is distinguishable from both Shea and Sonnenborn. While petitioner had access to a joint checking account from which she paid some of the family's expenses, *224 she did not have access to the majority of the family's finances. Quite to the contrary, her husband absolutely controlled the family finances. Only on rare occasions did petitioner use the joint checking account controlled by her husband. More importantly, nothing indicates that petitioner was involved in any way with her husband's law practice. We, therefore, find that petitioner was not so involved in her family's finances that she would have had reason to know of the omitted income from the embezzled funds. We also consider the forthrightness of petitioner's husband concerning the omitted income. Adams v. Commissioner, 60 T.C. 300, 301-303 (1973). In the instant case, when petitioner questioned her husband about finances, he alleviated her concerns by telling her that his law practice was more successful than ever. Petitioner believed that her husband was a prominent attorney. She also had no reason to doubt his explanation. She thought that borrowed funds were the source of some of their additional income. It was not until April 24, 1984, after the taxable years in issue, that petitioner learned about the embezzled funds. Based on the foregoing, *225 we hold that petitioner has established that she did not have reason to know of the omitted income. The next issue we must decide is whether it would be inequitable to hold petitioner liable for the deficiency. We consider all of the facts and circumstances. Sec. 1.6013-5(b), Income Tax Regs. A factor to be considered is whether the person seeking relief significantly benefitted, directly or indirectly, from the omitted income. Sec. 1.6013-5(b), Income Tax Regs. Normal support, however, is not considered a significant benefit. Terzian v. Commissioner, supra at 172; Mysse v. Commissioner, supra at 699. Sec. 1.6013-5(b), Income Tax Regs. Normal support is to be measured by the circumstances of the parties. Sanders v. Commissioner, 509 F.2d 162, 168 (5th Cir. 1975). A significant benefit exists if expenditures have been made which are unusual for the taxpayer's accustomed lifestyle. Terzian v. Commissioner, supra.
In the instant case, respondent argues that petitioner significantly benefitted from her husband's purchases of vacations, vehicles, and equipment and repayment of loans during the taxable *226 years in issue. As we noted above, however, we do not find such expenditures to be unusual, considering petitioners' standard of living to which she was accustomed. No unusual or "lavish" expenditures were made during the taxable years in issue. To the contrary, the lifestyle of petitioner's family decreased after her husband began embezzling funds from his clients. Petitioner's husband controlled the majority of the family finances and made all of the decisions as to how their funds were spent. Petitioner rarely used the checking account controlled by her husband and into which the embezzled funds were deposited. We also note that petitioner's lifestyle has been reduced to living in a two-bedroom apartment and working for an hourly wage of $ 6.44. All of the family's possessions, except a few items of furniture and clothing, have been sold or foreclosed upon to pay debts and repay embezzled funds. The record in the instant case does not lead us to conclude that any significant benefit accrued to petitioner from the embezzled funds. To the contrary, as petitioner argues, she has lost nearly everything as a result of her husband's embezzlement activities. Accordingly, we *227 hold that it would be inequitable to hold petitioner liable for the deficiency in the instant case. In conclusion, as petitioner meets all of the requirements of section 6013(e)(1), we hold that she is not liable for the deficiencies determined by respondent in the instant case. To reflect the foregoing, Decision will be entered for petitioner. Footnotes
1. The document recording the disbursements for the line of credit appears to have an error: it shows the first disbursement of $ 16,000 as being made on December 17, 1980, rather than December 17, 1979. Subsequent disbursements, however, are dated January and February 1980. Consequently, we believe that the first disbursement under the BancOhio line of credit was made on December 17, 1979, in keeping with the testimony of petitioner's husband that he had borrowed the maximum amount possible under the line of credit within a few months after receiving it.↩
2. The Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802, amended sec. 6013(e) retroactively to all years to which the Internal Revenue Code of 1954 applies.↩