MEYER AND BETTY WEISS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weiss v. Commissioner
Docket No. 5108-92
United States Tax Court
T.C. Memo 1995-70; 1995 Tax Ct. Memo LEXIS 71; 69 T.C.M. (CCH) 1888; February 13, 1995, Filed *71 Decision will be entered for respondent. For petitioners: Thomas W. Ostrander and Joshua Sarner. For respondent: Keith L. Gorman. PARR
PARR
MEMORANDUM OF FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax [1]
Sec.
Sec. Sec. Year
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
1978
$   3,934
$   1,967
--  --
1979
4,770
2,385
--  --
1980
18,960
9,480
--  --
1981
68,338
34,169
--  --
1983
3,767
--
$ 1,884
[1]
Petitioners have conceded all adjustments and additions to tax in the notice of deficiency, and that the period of limitations for each of the years in issue has not expired. The sole remaining issue is whether petitioner Betty Weiss is an innocent spouse under section 6013(e). [2] All references to petitioner will be to Meyer Weiss; references to petitioner *72 wife will be to Mrs. Weiss or Betty Weiss. FINDINGS OF FACT Many of the facts have been stipulated by the parties; the stipulation is made a part of the record herein. Petitioners resided in Coconut Creek, Florida, at the time the petition was filed. Mr. Weiss was employed as a revenue agent of the Internal Revenue Service (IRS) in Philadelphia, Pennsylvania, from October 1955 through the fall of 1984. He audited individual, partnership, and corporate Federal income tax returns. In the early 1950's, Mr. Weiss began a pattern of receiving bribes in return for compromising portions of tax liabilities under audit. This pattern continued until 1983. Petitioners concede that during the years in issue Mr. Weiss received bribes totaling $ 210,500 as follows: 1978 - $ 10,000 1979 - 11,500 1980 - 40,000 1981 - 139,000
*73 1983 - 10,000 During the years in issue, he received total wages (after withheld taxes) of $ 137,632. During the same years, petitioners' expenditures exceeded available wages by a total of $ 134,092. During each of the years in issue, 1978, 1979, 1980, 1981, and 1983, petitioners filed joint Federal income tax returns. They did not report any of the bribe payments received by Mr. Weiss. In 1983 or 1984, respondent's regional inspection office became suspicious that petitioner and certain other revenue agents in Philadelphia were receiving bribes. When confronted, Mr. Weiss confessed and cooperated in the investigation. To his best recollection, he identified the bribes he had received during and before the years in issue. He also prepared a written estimate for respondent of how the bribes and other legitimate income were spent during the years 1971 through 1984. On or about February 11, 1985, petitioner pled guilty to one count of conspiring to defraud the United States by means of bribery in violation of 18 U.S.C. sec. 371 and one count of bribery of a public official in violation of 18 U.S.C. sec. 201 *74 (c). He was sentenced to 4 years imprisonment on count 1, 15 years imprisonment on count 2 (suspended), 5 years probation, and fined $ 100,000. Petitioner went to prison on June 28, 1985, and was released to a halfway house in February of 1987, where he stayed until May 1987, a total of 23 months. As of the time of trial, he had paid approximately $ 60,000 of the $ 100,000 fine, and is currently paying $ 700 per month. Petitioners have three children: Kerry, David, and Mindy. Real Estate
In 1954, [3] *75 petitioners jointly purchased [4] their three-bedroom row house residence in Philadelphia for $ 13,990, including a mortgage. They lived there until 1988 when they sold it and moved to Florida. In October of 1972, petitioners purchased an investment property (hereafter Palm-Aire) in Pompano Beach, Florida, at a cost of $ 17,465, with a $ 10,500 mortgage. This property was held by petitioners jointly, and both executed the necessary closing papers including the mortgage note. This property was a fourth floor, efficiency condominium, with a small kitchen, a closet, and a bath. It was not located on the beach. Petitioners' family vacationed there once a year during Christmas time. In 1980, petitioners contributed $ 14,402 to a partnership formed with the three other couples to purchase two condominiums in Fort Lauderdale, Florida (hereafter Bonaventure). Each unit had two bedrooms and two baths. The condominiums together cost $ 134,963, of which $ 91,845 was financed by a mortgage. The remainder of the purchase price and other closing *76 costs were shared by the four couples. Both petitioners executed the necessary closing papers for Bonaventure, including the mortgage note. In 1981 and 1982, petitioners contributed $ 4,005 and $ 2,000, respectively. Automobiles
In 1983, petitioners paid $ 4,975 cash to Sussman Oldsmobile towards the purchase of an automobile. In 1984, Mr. Weiss transferred title of a 1981 Honda to Mindy, who partially repaid her parents later. In April 1987, they paid $ 2,458 towards the purchase of a 1982 Datsun. On May 29, 1987, petitioners bought a 1987 Honda Accord LX for $ 13,400 from Sussman Oldsmobile, titled in Mrs. Weiss' name. Mr. Weiss wrote a check for $ 8,263. We assume the remainder was paid by a trade-in, since no lien was placed on the automobile. Mrs. Weiss has never driven an automobile. Country Club
Before and during the years in issue, petitioners were members of the Melrose Country Club in Cheltenham, Pennsylvania. From 1979 through 1984, they spent approximately $ 30,000 for membership fees and other expenses relating to the Melrose Country Club. During the years of membership, Mr. Weiss golfed and Mrs. Weiss played tennis approximately three times *77 a week. Mrs. Weiss continued her membership at Melrose through 1987, while Mr. Weiss was in prison, paying at least $ 1,675 in that year. Janney Investments
Petitioners' Accounts
From 1954 through 1986, petitioners had a joint brokerage account at Janney Montgomery Scott (Janney). Mrs. Weiss signed the documents opening the account. Janney mailed monthly account statements to petitioners at their residence each month that there was account activity. Janney also sent confirmation slips within 5 days of each purchase or sale. On January 20, 1988, petitioners received $ 3,016 relating to a Van Kampen U.S. Government Fund (Van Kampen), which they deposited into their bank account. On May 12, 1988, they deposited $ 1,317.35 in their bank account relating to "stock". On October 11, 1990, they made a deposit of $ 1,655.20 relating to 40 "Series EE bonds". In May of 1984, both petitioners signed a Janney Equity and Index Option Trading Agreement form, explaining the speculative nature of options and the risks in such trading. In that document, petitioners represented they possessed $ 4,000 cash, $ 27,950 in securities, and $ 40,000 in assets other than home equity. We *78 assume this amount included petitioners' equity in Bonaventure and Palm Aire. Mrs. Weiss knew her husband traded in the stock market with Janney in several accounts, including a joint account with her and accounts in the names of the children and his mother. She knew that Albert Berkow was her husband's broker. She was unaware of the nature of equity trading, the particular trades her husband made, whether he earned or lost money, and the particulars (discussed below) of the IRA opened and funded in her name. Betty Weiss did not make any trade in any account. Investments in the Children's Names
In 1980, Mr. Weiss opened accounts and made investments in the names of David Weiss and Mindy Weiss. Mr. Weiss controlled both accounts. Additional investments were made in the name of Mindy Weiss from December 11, 1980, through at least September 26, 1986. All of the account statements for David and Mindy were sent to them at petitioners' address. Investments were made in the name of Kerry Weiss from April 1983, through at least May of 1987. Through July of 1985, the statements for Kerry's account were sent to him at petitioners' address. The record does not show who made all *79 of the purchases in Kerry's account. Mr. Weiss made at least some of them, such as on August 26, 1983, when he put $ 1,648.24 into the account. In April 1987, Janney was directed (presumably by Mr. Weiss) to transfer the Montgomery County Industrial Development (MCID) bonds held in the account of Pauline Shankman (Mr. Weiss' mother, discussed below) to Kerry's account, where they were sold for $ 9,830. In 1988, Kerry deposited a total of $ 26,500 into petitioners' bank accounts. Mrs. Weiss' IRA
In each of the years 1982, 1983, and 1984, petitioners contributed $ 2,250 to their IRA's. Mrs. Weiss' IRA was opened at Janney in June of 1982 and $ 1,125, $ 1,125, and $ 1,503 were contributed in 1982, 1983, and 1984, respectively. On December 29, 1989, 376 shares of Van Kampen worth $ 5,648.22 were deposited into Mrs. Weiss' IRA account. Van Kampen was a stock fund. Proceeds from the sale of this stock were subsequently deposited in petitioners' joint checking account in 1990. The source of the funds used to acquire the Van Kampen stock is as follows. On September 4, 1985, and January 28, 1986, respectively, 123 and 238 shares (total 361 shares) of Van Kampen stock were purchased *80 by Mr. Weiss through Mindy Weiss' account. These shares at the time of their purchase were worth $ 6,007.23. The shares of this fund were "unissued" and delivered to Van Kampen. Mrs. Weiss' IRA records indicate that on January 9, 1990, 376 shares (15 more shares than delivered to Van Kampen) were received into the IRA account. The records further indicate that "these shares, or a portion thereof, are held in unissued form at the agent or fund custodian. Share quantities are approximate and may not reflect current reinvestments." We conclude that the Van Kampen stock deposited into Mrs. Weiss' account came from Mindy Weiss' account. In 1990, Mrs. Weiss received a partial distribution from the IRA in the amount of $ 6,146.74. As of 1991, there remained $ 5,752.39 in the account. Pauline Shankman's Account
In 1982, Mr. Weiss purchased $ 17,500 of coupon bonds in the name of Pauline Shankman. One of the bonds was a MCID. Mr. Weiss made the trades in the Shankman account; the broker at Janney never met Pauline Shankman. Some of the interest on the bonds was deposited in petitioners' checking accounts. From December 1982 through September 1993, the address of record for *81 Pauline Shankman's brokerage account has been petitioners' Philadelphia address. Pauline Shankman never lived at that address; she lived in Florida until her death in 1986 or 1987. In April of 1983, petitioners transferred $ 20,000 from their brokerage account to the account of Pauline Shankman. The money was used to purchase Series K government-backed securities (GNMA's). According to Janney's records, the GNMA's were still outstanding as of September 1993, and still show Mrs. Shankman's address as petitioners' former Philadelphia residence. The value of the GNMA's on that date was $ 3,504.78. In April of 1987, Janney was directed to transfer the MCID bond held in the Shankman account to Kerry's account where it was sold for $ 9,830. Educational Expenses
Kerry Weiss
In 1971, petitioners' eldest son, Kerry, enrolled in Muhlenberg College, which he attended from the fall semester of 1971 through the spring semester of 1975. Approximately $ 30,330 was spent over 4 years to pay his expenses there. From 1976 through 1980, Kerry attended medical school in the Philippines at the University of the East, Ramon Magsaysay Memorial Medical Center, College of Medicine. Approximately *82 $ 46,000 was expended for his room, board, tuition, food, and other expenses while he was a student in the Philippines. During 1980 and 1981, Kerry attended New York Medical College, during which petitioners paid approximately $ 11,000 for his tuition and living expenses. This was partially financed by a $ 5,000 student loan. David Weiss
From 1974 through 1979, petitioners' son, David, attended Washington University in St. Louis, Missouri. Petitioners paid approximately $ 39,741 for his tuition and living expenses. David attended the University of Miami in Miami, Florida, in the fall of 1979, and petitioners paid approximately $ 12,020 for his expenses. David's expenses were partially financed by a $ 4,000 student loan. In 1981, he began Delaware Law School in Wilmington, Delaware, where he was a student through the spring of 1984. All the law school expenses totaled approximately $ 19,320, which petitioners paid. Mindy Weiss
Petitioners' daughter, Mindy, was a student at Philadelphia College of Textiles from the fall semester of 1976 through the spring semester of 1980. Petitioners spent approximately $ 41,505 for her tuition and miscellaneous living expenses *83 at Philadelphia College of Textiles. After her graduation, from 1981 through 1985, petitioners paid approximately $ 9,000 to supplement Mindy's living expenses. Mr. Weiss paid all the children's college expenses and gave them spending money. Mrs. Weiss was aware that her husband was paying for the children's education; in fact when she first became aware of the bribes, she assumed the proceeds went to pay for the children's schools, because she knew that was the biggest expense she and her husband had. Miscellaneous Expenditures
Mrs. Weiss received a gold necklace from her husband in 1975 and a diamond pin in 1980, both as wedding anniversary gifts. The cost of the jewelry is not in the record. In 1979, [5] petitioners renovated the kitchen at their residence in Philadelphia at a cost of approximately $ 9,000, including replacement of the oven and refrigerator. *84 During 1982 and 1983, petitioners spent approximately $ 8,000 for the nursing home care of Mrs. Weiss' mother. In 1984, they incurred $ 8,000 for legal fees. In each year from 1979 through 1984, petitioners spent approximately $ 15,000 for general living expenses, in addition to those connected with the children. During, in, or after the years at issue, petitioners paid the following expenses: Philadelphia Eagles season tickets for the family (Mrs. Weiss did not attend the games); Kerry's dues at Cheltenham Racket Club in March of 1985; Mindy's rent at Presidential Apartments in 1985; and payment of $ 2,038 for Mindy's engagement party in June of 1985. In January of 1988, petitioners paid $ 3,100 for the funeral expenses of Mrs. Weiss' mother. In February 1988, a check in the amount of $ 1,033 labeled "Ruth's funeral check" was deposited in petitioners' account. Petitioners' Education and Family Dynamics
Petitioners were married in 1951 and remained married at time of trial. Meyer Weiss graduated from the University of Pennsylvania in 1949 with a bachelor's degree in economics and subsequently became a certified public accountant (CPA). Mrs. Weiss immigrated to the *85 United States from Poland in 1929 at age 5. She graduated from high school in 1942 and received no further education. After high school she worked full time for 12 years placing orders for a dental company. Mrs. Weiss has no formal education in, and little or no knowledge of, accounting or tax matters. After her first child was born in 1954, Mrs. Weiss was a full-time homemaker. As of the date of trial, Mrs. Weiss had never driven an automobile and relied on her husband to assist her in grocery shopping. From the time of the marriage until shortly before his incarceration, Mr. Weiss exercised exclusive control over the family's finances, and Mrs. Weiss relied on her husband to make all financial decisions for the family. This seems to have been a consensual and convenient arrangement; there is nothing to indicate that Mr. Weiss was domineering or abusive. Mr. Weiss maintained all financial records on a desk in the basement of the home, where he reviewed and paid the family bills and performed his personal and professional work in the evenings. Mrs. Weiss received the mail at home, but did not open it unless she thought it was personal in nature. Mr. Weiss wrote all the checks, *86 maintained check registers, made all the deposits and withdrawals, and balanced the checkbooks, although all accounts were in joint names. Mrs. Weiss was unaware of the amounts of any deposits or withdrawals and the specific balances in the checking accounts, although the records were not hidden from her and Mr. Weiss was not secretive about them. Mrs. Weiss did not write checks or make check register entries until shortly before her husband's imprisonment. Mr. Weiss reviewed, prepared, and updated all financial documents. He made the financial decisions regarding investments, financing for real estate, selecting banks, asset purchases, and financing the children's education. When there was a need to sign documents, such as tax returns, deeds, mortgages, or loan applications, Mr. Weiss would ask Mrs. Weiss to sign and she would usually do so without reviewing the contents of the document or discussing the specifics of it with her husband. Mrs. Weiss relied on her husband because she assumed he, as a CPA and IRS agent, was better qualified than she concerning financial matters. Petitioners' children perceived their father as in control of the finances, and thus did not discuss *87 finances, including their tuition expenses, with their mother. When Mr. Weiss came under criminal investigation in 1984, and during his imprisonment, Mrs. Weiss and their daughter, Mindy, undertook some of the tasks of managing the finances. Mr. Weiss and Mindy taught Mrs. Weiss how to write checks and balance the checkbook. Most of the time Mindy wrote the checks and balanced the checkbook. Mr. Weiss was imprisoned from June 28, 1985, through February of 1987 when he was released to a halfway house where he stayed until May of 1987. During this time, Mrs. Weiss received $ 2,000 per month from Mr. Weiss' Government pension and $ 100 Social Security. Mindy lived with her, and may have contributed to family expenses, although the record is silent. Check registers submitted by petitioners show expenditures by check in 1985 of $ 41,184.47, in 1986 of $ 29,086.38, and in 1987 of $ 45,253.74. Present Circumstances[6]
*88 At the time of trial, Mrs. Weiss was 69 years old. Her husband was suffering from Parkinson's disease, and was no longer a CPA. His license was revoked as a result of his criminal conduct. At the time of trial, Mr. Weiss was receiving approximately $ 2,200 per month from a Government pension. Mrs. Weiss was receiving approximately $ 150 per month from Social Security. Petitioners also sold lucite on weekends at a flea market in Florida to make extra money. At the time of trial, petitioners had an average balance of approximately $ 1,100 in their checking account and $ 21,020 in their money market account. They owned and resided at 1701 Andros Isle, Apartment B-3, Coconut Creek, Florida. This is a two-bedroom, two-bath condominium in a retirement community. They purchased this property in 1988 for approximately $ 75,000. They did not secure a mortgage. They applied the proceeds of the sale of their Philadelphia, Pennsylvania, residence which they sold in 1988 for $ 64,000. In connection with their move to Florida, they also sold their furniture in Philadelphia in 1988 for between $ 7,000 and $ 8,000. Petitioners' Florida residence was furnished by Mrs. Weiss at a cost *89 of approximately $ 14,000. At the time of trial, Mr. Weiss also owned a Dodge Caravan wagon which he purchased in October 1990, at a cost of $ 19,869, plus fees and taxes of $ 601.31. He paid $ 500 on October 6, $ 5,563.61 on October 30, traded in the 1987 Honda for $ 10,229, got a $ 500 rebate, and financed the remaining $ 5,016.32 (including finance fees) with an auto loan, payable at $ 129.64 per month. At the time of trial petitioners also owned bonds worth approximately $ 500. Presumably, the GNMA's worth $ 3,505 remained in Mrs. Shankman's account, under Mr. Weiss' control. Petitioners no longer owned the Palm-Aire property. They sold it a few years before the trial for approximately $ 20,000. They no longer owned the Bonaventure property. They abandoned it because, as a result of Mr. Weiss' conviction, they could no longer afford to make the payments. OPINION Preliminarily, petitioners ask that the appendix to respondent's opening brief be stricken for two reasons. First, it causes the brief to exceed the 50-page limit the Court set at trial. Second, it is a document which we refused to receive into evidence at trial because it was presented to petitioners after *90 the time for exchanging documents had expired. We agree with petitioners. The appendix is stricken. Petitioners concede all issues raised in the notice of deficiency. The only remaining issue is whether Betty Weiss qualifies as an "innocent spouse". The rate of tax applied against a given amount of income generally is lower when the income is reported on a joint return than when a husband and wife file separate returns. The price which the law exacts for this privilege is that taxpayers who file a joint return are jointly and severally liable for the amount of tax due, regardless of the source of income reported and notwithstanding the fact that one spouse may be less informed about the contents of the return. Sec. 6013(d)(3); Stevens v. Commissioner, 872 F.2d 1499, 1503 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Sonnenborn v. Commissioner, 57 T.C. 373, 381 (1971). This general rule is somewhat mitigated by the innocent spouse provisions of section 6013(e), which relieves a spouse of joint Federal income tax liabilities if each of the following four elements is met: (1) A joint Federal *91 income tax return was filed by the spouses; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the claimed innocent spouse did not know, and had no reason to know, of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold the claimed innocent spouse liable for the deficiency attributable to the understatement. Sec. 6013(e)(1). The taxpayer bears the burden of proving that each of these elements is satisfied. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners' failure to satisfy any one of these elements precludes innocent spouse relief. Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Respondent concedes that Mrs. Weiss meets all of the requirements to be an innocent spouse, except whether she knew or had reason to know of the understatement when she signed the returns and whether it is inequitable to hold her liable. Petitioners have the burden of affirmatively proving that Mrs. *92 Weiss did not actually know or have reason to know of the substantial understatements. Stevens v. Commissioner, supra at 1505. Respondent does not contend, and we do not believe, that Mrs. Weiss knew about the understatement when she signed the returns in issue. We find that Mrs. Weiss did not have actual knowledge of the understatement when she signed the returns for each of the years in issue. We thus turn to the question of whether Mrs. Weiss had reason to know of the substantial understatement caused by Mr. Weiss' receipt of bribes. We find that she did have reason to know. A spouse has "reason to know" if a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted. Stevens v. Commissioner, supra (citing Sanders v. United States, 509 F.2d 162, 167 (5th Cir. 1975)). The test establishes a "duty of inquiry" on the part of the alleged innocent spouse. Id.[3]
*93 Generally relevant to the "reason to know" determination are the alleged innocent spouse's level of education; the spouse's involvement in the family's business and financial affairs; the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and the culpable spouse's evasiveness and deceit concerning the couple's finances. Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989); Stevens v. Commissioner, supra at 1505. A spouse cannot be excused from the imputation of constructive knowledge simply because she was a homemaker and relied on her husband to handle the family's finances. Stevens v. Commissioner, supra at 1507; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310. If a spouse knows enough facts to be put on notice of the possibility of an understatement, he or she has a duty to inquire further. Guth v. Commissioner, 897 F.2d 441, 444-445 (9th Cir. 1990), *94 affg. T.C. Memo. 1987-522. Failure to inquire may cause knowledge of the understatement to be imputed to the taxpayer. McCoy v. Commissioner, 57 T.C. 732, 734 (1972); see also Stevens v. Commissioner, supra; Adams v. Commissioner, 60 T.C. 300, 303 (1973). Mrs. Weiss was relatively unsophisticated where financial matters were concerned, but she was not totally naive. She struck us as an intelligent witness, aware of her family's needs and concerned about them. She had worked for 12 years before her first child was born, receiving paychecks, paying bills, and apparently filing (or causing to be filed) income tax returns -- at least until she married and began to rely on Mr. Weiss. She knew she and her husband had investments at Janney, that there was frequent activity in the account (from the amount of mail that came to the house), and that he also made investments in the names of the children and Mrs. Shankman. Although she claims not to have known about her own IRA, she did sign the papers to open it. In addition, in May of 1984, several months before *95 Mr. Weiss was confronted by the IRS, Mr. and Mrs. Weiss signed a Janney financial form which represented that they possessed $ 27,950 in securities. We believe she knew what the statement said. Mrs. Weiss knew she and her husband owned their house, a small condominium, and a 25-percent interest in a partnership owning two other, larger condominiums. She knew they belonged to a country club, where they lunched, played tennis, and golfed frequently, and that there were costs associated therewith. Surely, in her conversations with other women at the club with whom she lunched, or from other sources, she was made aware that it was expensive. In fact, the country club cost approximately $ 5,000 per year, which during the years in issue represented from 20 to 25 percent of Mr. Weiss' annual take-home pay. We believe a reasonable person in Mrs. Weiss' circumstances would have recognized that the country club expense was unusual, and would have inquired further. "One person's luxury may be another's necessity, and the lavishness of an expense must be measured from each family's relative level of ordinary support." Kistner v. Commissioner, 18 F.3d 1521, 1525 (11th Cir. 1994), *96 revg. and remanding T.C. Memo. 1991-463; Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975). Mrs. Weiss did the family shopping, and must have been generally aware of the prices of food and consumer items. Her kitchen was renovated and new appliances were purchased. Since she was the family member who later purchased furniture for the Florida residence, we believe she would have been the one to select the appliances, kitchen cabinets, and other details, and would have thus known at least some of the cost. She knew she and her husband did not have credit cards, and that he paid for things by check. She knew they paid for her mother's nursing home at a cost of $ 8,000. More important, she knew that she was not required to go to work to help pay for her children's educations, which included medical school and law school. Although she may have been unaware of the specifics, she surely knew that college, medical school, and law school are expensive. We believe a reasonable person in Mrs. Weiss' circumstances would have asked how these expenses were being met. We assume she knew what her husband earned -- if not, *97 she should have known. He did not hide it from her, and she saw and signed the income tax returns. During the years in issue, petitioners' expenditures were nearly double Mr. Weiss' wages. At some point a reasonable person would have asked, "How can we afford this?" A taxpayer may satisfy the duty to inquire by taking reasonable steps to determine the accuracy of the return, such as by questioning his or her spouse and receiving a plausible explanation. Estate of Killian v. Commissioner, T.C. Memo. 1987-365. Mrs. Weiss preferred not to know. We therefore find that Mrs. Weiss had reason to know of the unreported income, and thus she is not entitled to relief. However, even if Mrs. Weiss did not have reason to know, petitioners have not shown that it would be inequitable to hold her liable. In deciding whether it is inequitable to hold a spouse liable for a deficiency, we take into account whether the purported innocent spouse significantly benefited beyond normal support, either directly or indirectly, from the unreported income or erroneous deductions. See Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), *98 affd. 826 F.2d 470 (6th Cir. 1987); H. Rept. 98-432 (part 2), at 1501, 1502 (1984); sec. 1.6013-5(b), Income Tax Regs. Normal support is not a significant benefit for purposes of deciding whether it is inequitable to hold a taxpayer-spouse liable for the deficiency. Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979); sec. 1.6013-5(b), Income Tax Regs. Normal support is determined by the circumstances of the taxpayers. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975); Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); Flynn v. Commissioner, 93 T.C. 355, 367 (1989). Mrs. Weiss argues that she received only normal support. Her home was modest; she did not receive elaborate gifts or take expensive vacations. We disagree. Mrs. Weiss enjoyed and used the country club, a significant benefit. Moreover, she was not required to go to work (or into significant debt) to help pay for her children's educations, which included medical school and law school. Her way of life was uninterrupted by their schooling, a statement *99 that most middle and even upper-middle class parents cannot make. She received direct benefits as well. Mrs. Weiss was asked at trial whether she was concerned about how she was going to afford to live while her husband was in prison. She answered, "Well, I was receiving his check. He had a retirement check coming in." Question: "The pension?" Answer: "Yes." Mr. Weiss' pension was $ 2,000 per month and her own Social Security was $ 100. Nevertheless, when Mr. Weiss was in prison, Mrs. Weiss was able to live at a level that would have surely been impossible if the bribes had never been received. The record shows that, although her husband was fired in the fall of 1984, and incarcerated from June 1985 through February 1987 -- and Mrs. Weiss was not employed -- checks were written from petitioners' joint account in the amounts of $ 41,184.47 in 1985, $ 29,086.38 in 1986, and $ 45,253.74 in 1987. These amounts exceeded -- in some cases, greatly exceeded -- Mr. Weiss' prior IRS salary. Mrs. Weiss continued her membership in the country club through 1987. Although he listed the children's and Mrs. Shankman's accounts in his list of expenditures presented to the IRS, Mr. Weiss did *100 not include any of petitioners' Janney investments (except their IRA's). Petitioners now argue that living expenses for Mrs. Weiss while petitioner was in prison, and for both of them later, came partly from legitimate investment income, none of which was purchased with bribe money. However, there is no evidence that the bribe income was ever segregated from legal income, and we see no basis for such a finding. Moreover, it appears that Mrs. Weiss benefited from investments made in the names of the children and Pauline Shankman. In April 1987, MCID bonds were transferred from Ms. Shankman's account to Kerry Weiss' account and sold for $ 9,830. The record is silent about who received the proceeds. But in 1988 Kerry deposited a total of $ 26,500 into petitioners' bank accounts. In addition, Van Kampen shares worth $ 5,648.22 were deposited into Mrs. Weiss' IRA; petitioner agrees and we have found that they came from Mindy Weiss' account. After the years in issue, petitioners purchased a 1982 Datsun (probably for Mindy) and a new Honda Accord LX in Mrs. Weiss' name. In 1990, the Honda was traded in for a new $ 20,000 Dodge Caravan wagon, titled in Mr. Weiss' name. Although *101 she does not drive, Mrs. Weiss benefited indirectly from the automobiles, since her husband provides her transportation. We recognize that Mr. and Mrs. Weiss are both advancing in age, and Mr. Weiss is in poor health. However, they are still married, and she shares the benefits of a middle class lifestyle. The car and his Government pension are in Mr. Weiss' name. Mrs. Weiss' only sole asset is her Social Security. Everything else is held as joint tenants with right of survivorship. Throughout the marriage Mrs. Weiss received the benefit of petitioners' income, as well as the benefit of joint rates on their income tax returns. It would not be, under the circumstances, inequitable to hold her jointly liable for the taxes. For the reasons set out above, we find that Mrs. Weiss is not entitled to innocent spouse status. Decision will be entered for respondent. Footnotes
1. These amounts are determined against Meyer Weiss only.↩
1. 50 percent of the interest due on $ 3,767.↩
2. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. Petitioners object, on the grounds of relevance, that no evidence of years prior to those in issue should be considered. However, this evidence shows the pattern of family life, petitioners' standard of living, and the source of some assets and income received and expended during and after the years in issue. These matters are relevant to the issues of whether Mrs. Weiss should have known of the understatement and whether it would be inequitable to hold her jointly liable for the taxes.↩
4. Throughout this opinion we use terms such as, "petitioners contributed" or "petitioners spent" to indicate simply that funds came from jointly owned assets. We do not imply by these expressions that Mrs. Weiss was always aware of the expenditures.↩
5. There is a dispute about the year of repairs to petitioners' house. The stipulation says, "According to Exhibit 6-F, in 1976, approximately $ 9,000 was spent renovating the kitchen at petitioners' residence in Philadelphia." Respondent requests a finding that this occurred in 1979 and petitioner objects. The Court's examination of Exhibit 6-F reveals that the year cited in that document is 1979. We thus so find.↩
6. Facts concerning years after those in issue bear on the issue of whether it would be inequitable to hold Mrs. Weiss jointly liable.↩
3. Cf. Kistner v. Commissioner, 18 F.3d 1521 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463↩, where wife was physically and mentally abused.